******************************************************

    The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

    All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

    The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# DANIEL DIAZ *v.* COMMISSIONER OF CORRECTION
## (AC 41159)

DiPentima, C. J., and Alvord and Keller, Js.*

*Syllabus*

The petitioner, who had been convicted of various drug and weapons charges, appealed to this court following the denial of his petition for certification to appeal from the judgment of the habeas court denying his second petition for a writ of habeas corpus. The petitioner had been convicted at a second trial after our Supreme Court had reversed the judgment of conviction at his first trial. At the petitioner's first habeas trial, the court reporter alleged that the habeas judge, C, a police detective, and P, the prosecutor at both of the petitioner's criminal trials, were involved in a scheme in which C gave hand signals to P during her testimony that prompted the judge to interrupt or to allow P to finish her answer before offering a different answer and an opportunity to amend her response. The Office of the Chief State's Attorney thereafter conducted an investigation and prepared a written report, and the habeas judge declared a mistrial after more than six months passed since the judge had last heard evidence. At the petitioner's second habeas trial, the petitioner alleged, inter alia, that P, at his first criminal trial, had intentionally failed to disclose certain exculpatory evidence in violation of *Brady* v. *Maryland* (373 U.S. 83) and elicited perjured testimony from L, who, in exchange for leniency in connection with a drug offense he had been charged with, cooperated with the police in arranging to purchase drugs from the petitioner. The petitioner further alleged that P's *Brady* violations constituted prosecutorial impropriety that rendered his prosecution at his second criminal trial a violation of his right against double jeopardy. Finally, the petitioner alleged that F, his defense counsel at the second criminal trial, had rendered ineffective assistance and had a conflict of interest that resulted from F's employment as a police officer while representing the petitioner. The habeas court denied each of the petitioner's claims, and rendered judgment denying his petition for a writ of habeas corpus and his petition for certification to appeal. *Held*:

1. The habeas court did not abuse its discretion when it denied the petitioner's petition for certification to appeal on the ground that it improperly denied his motion for an evidentiary hearing to preclude the testimony of P and C: the court's prohibition of P's testimony would have frustrated its ability to adjudicate the petitioner's claims, the need for an evidentiary hearing was outweighed by the time and resources that would have been expended to conduct such a proceeding, and, although the court invited the petitioner to make whatever record he wanted as to the hand-signaling scheme that might support his *Brady* and double jeopardy claims, the petitioner did not make an offer of proof, call P, C or the court reporter as witnesses or bring to the court's attention the report by the chief state's attorney's office; moreover, contrary to the petitioner's assertion, the court was not required to conduct a collateral evidentiary hearing to explore the hand-signaling incident, as the second habeas trial was a collateral hearing that was dedicated in part to the adjudication of his *Brady* and double jeopardy claims, the court's denial of his request for an evidentiary hearing was harmless, as any evidence developed at such a hearing as to P's intent to commit *Brady* violations or that damaged her credibility would not have meaningfully enhanced the merits of his double jeopardy claim, and, even if the petitioner had proven that P's nondisclosures constituted a *Brady* violation, the relief was a new trial, which he received when the Supreme Court reversed the judgment of conviction at his first trial; furthermore, the petitioner could not prove his double jeopardy claim, as the evidence overwhelmingly supported the petitioner's convictions, and, thus, it was unlikely that P would have believed during the petitioner's first criminal trial that he was likely to be acquitted in the absence of her allegedly intentional *Brady* violations, and, although L falsely testified during the first criminal trial that he had been arrested for possession of narcotics he

purchased from the petitioner, the source of the drugs that led to L's arrest was of minimal relevance to the charges against the petitioner, as the police officers who testified never stated that those drugs were connected to L's cooperation with the police.

2. The habeas court did not abuse its discretion when it denied the petitioner certification to appeal on the ground that it improperly denied his claim that F rendered ineffective assistance; the petitioner did not present this court with any law that held that F's simultaneous representation of the petitioner and his employment as a police officer established a conflict of interest, the petitioner did not point out any specific instances that suggested that F's interests were compromised for the benefit of a third party or any errors by F that were so serious that he did not function as the counsel guaranteed by the sixth amendment, and, although the petitioner asserted that F had a conflict of interest because he was required by statute (§ 54-1f) to arrest the petitioner if F had reasonable grounds to suspect that the petitioner had committed a felony crime, the petitioner did not direct this court to any specific instance in which § 54-1f or any other legal obligation F had as a police officer impaired his ability to provide the petitioner with adequate and uncompromised defense representation.

Argued June 17—officially released September 29, 2020

*Procedural History*

Amended petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland and transferred to the judicial district of Fairfield, where the matter was tried to the court, *Devlin, J.*; judgment denying the petition; thereafter, the court denied the petition for certification to appeal, and the petitioner appealed to this court. *Appeal dismissed.*

*Robert L. O'Brien*, assigned counsel, with whom, on the brief, was *Christopher Y. Duby*, assigned counsel, for the appellant (petitioner).

*Mitchell S. Brody*, senior assistant state's attorney, with whom, on the brief, were *Brian Preleski*, state's attorney, and *Angela R. Macchiarulo*, senior assistant state's attorney, for the appellee (respondent).

*Opinion*

ALVORD, J. The petitioner, Daniel Diaz, appeals from the judgment of the habeas court denying his petition for certification to appeal from the court's denial of his petition for a writ of habeas corpus. On appeal, the petitioner claims that the court (1) abused its discretion in denying his petition for certification to appeal, (2) improperly denied his request for an evidentiary hearing, and (3) improperly denied his ineffective assistance of counsel claim. We conclude that the court properly exercised its discretion in denying the petition for certification to appeal and, accordingly, dismiss the appeal.

The following facts and procedural history are relevant to this appeal. "In early 2001, the [petitioner] was under investigation by the New Britain [P]olice [D]epartment for illegal drug related activities. On March 13, 2001, New Britain police officers arrested Kevin Lockery, who was known by the police as a drug user, for a narcotics offense. In an effort to gain lenient treatment, Lockery identified the [petitioner] as a drug dealer and provided the police with information about the [petitioner]. At the direction of the police, Lockery called the [petitioner] on a cellular telephone and arranged to purchase five bags of heroin at a specific location in New Britain. Shortly after the [petitioner] received Lockery's call, the [petitioner] left his residence and drove to that location. Lockery did not meet the [petitioner] as arranged, and, after several minutes, the [petitioner] began to drive away.

"Police officers stopped the [petitioner's] automobile. A search of the [petitioner] yielded twenty-five packets of heroin, $1025 and a cellular phone that displayed among received calls the telephone number from which Lockery had called the [petitioner] to arrange the drug purchase. A subsequent search of the [petitioner's] residence, pursuant to a warrant, yielded 168 packets of heroin, sixteen grams of marijuana, a twelve gauge shotgun, several shotgun shells and numerous other items typically used in the sale and distribution of illegal drugs." *State* v. *Diaz*, 109 Conn. App. 519, 522–23, 952 A.2d 124, cert. denied, 289 Conn. 930, 958 A.2d 161 (2008).

In his first criminal trial in 2002, the petitioner was found guilty by a jury of having committed multiple charged offenses, but the judgment of conviction was reversed by our Supreme Court because the petitioner had received an inadequate canvass from the trial court regarding his decision to waive counsel and represent himself. See *State* v. *Diaz*, 274 Conn. 818, 828, 878 A.2d 1078 (2005). In his second criminal trial in 2006, the petitioner was found guilty by a jury of possession of narcotics with intent to sell by a person who is not drug-dependent in violation of General Statutes § 21a-278 (b), two counts of possession of narcotics in viola-

tion of General Statutes § 21a-279 (a), and criminal possession of a firearm in violation of General Statutes § 53a-217 (a) (1). This court affirmed the judgments of conviction on appeal. See *State* v. *Diaz*, supra, 109 Conn. App. 519.

On March 25, 2013, the self-represented petitioner filed a petition for a writ of habeas corpus. On May 13, 2015, the petitioner, with the assistance of counsel, filed an amended petition for a writ of habeas corpus, which is the operative petition in this appeal. The petition contained five counts, only four of which are relevant to this appeal.[1] In the first count, the petitioner alleged that during his first criminal trial, the prosecutor failed to disclose exculpatory evidence in violation of *Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). Specifically, the petitioner alleged that the prosecutor had failed to disclose (1) Lockery's criminal record, (2) the fact that the drugs that were found on Lockery during his March 13, 2001 arrest were not purchased from the petitioner, as Lockery testified during the first criminal trial, and (3) that the packaging of the drugs that were found on Lockery displayed a different logo than the logo on the packaging of the drugs that were discovered on the petitioner's person and at his residence. In the second count, the petitioner alleged that the prosecutor's deliberate *Brady* violations constituted prosecutorial impropriety, thereby rendering his further prosecution in the second criminal trial a violation of his constitutional right against double jeopardy.

In the third count, the petitioner alleged that Frank Canace, his defense counsel in the second criminal trial, had a conflict of interest as a result of his employment as a New Haven police officer while representing the petitioner as a special public defender. The petitioner alleged that Canace's conflict of interest manifested itself when he failed (1) to move to dismiss the petitioner's criminal charges on double jeopardy grounds, (2) to identify false statements made by police officers in the search warrant affidavit, and (3) to adequately cross-examine police officers concerning their prior inconsistent statements and the discrepancy between the logos on the packaging of the drugs seized from the petitioner and those discovered on Lockery prior to his March 13, 2001 arrest. In the fourth count, the petitioner alleged that Canace rendered ineffective assistance of counsel.

A trial on the petition was held before the habeas court, *Devlin, J.*, on July 27, 28 and 31, 2017 (second habeas trial).[2] On August 16, 2017, Judge Devlin issued a memorandum of decision in which he denied each of the petitioner's claims. Thereafter, the petitioner filed a petition for certification to appeal from Judge Devlin's denial of his petition for a writ of habeas corpus. Judge Devlin denied the petition for certification to appeal,

and the petitioner filed this appeal. Additional facts will be set forth as necessary.

We begin by setting forth the standard of review of appeals from the denial of a petition for certification to appeal. "Faced with a habeas court's denial of a petition for certification to appeal, a petitioner can obtain appellate review of the dismissal of his petition for habeas corpus only by satisfying the two-pronged test enunciated by our Supreme Court in *Simms* v. *Warden*, 229 Conn. 178, 640 A.2d 601 (1994), and adopted in *Simms* v. *Warden*, 230 Conn. 608, 612, 646 A.2d 126 (1994). First, [the petitioner] must demonstrate that the denial of his petition for certification constituted an abuse of discretion. . . . Second, if the petitioner can show an abuse of discretion, he must then prove that the decision of the habeas court should be reversed on the merits. . . . As to the first prong, the standard requires the petitioner to demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further. . . . In determining whether the habeas court abused its discretion in denying the petitioner's request for certification, we necessarily must consider the merits of the petitioner's underlying claims to determine whether the habeas court reasonably determined that the petitioner's appeal was frivolous." (Citation omitted; internal quotation marks omitted.) *Lenti* v. *Commissioner of Correction*, 195 Conn. App. 505, 509–10, 225 A.3d 1233, cert. denied, 335 Conn. 905, 226 A.3d 151 (2020).

On appeal, the petitioner raises two claims, both of which he argues satisfy the first prong of the *Simms* standard because they are debatable among jurists of reason, could be resolved differently by another court, and/or involve questions that are adequate to deserve encouragement to proceed further. See, e.g., id., 509. First, the petitioner claims that the court improperly denied his request for an evidentiary hearing prior to permitting the respondent, the Commissioner of Correction, to introduce testimony at his second habeas trial from Mary Rose Palmese, the assistant state's attorney during both of his criminal trials. Second, the petitioner asserts that the court improperly denied his ineffective assistance of counsel claim. For the reasons set forth in parts I and II of this opinion, we conclude that the petitioner has failed to show that his claims are debatable among jurists of reason, that a court could resolve the issues in a different manner, or that the questions are adequate to deserve encouragement to proceed further. We therefore conclude that the habeas court did not abuse its discretion in denying the petition for certification to appeal.

I

The petitioner first claims that the court improperly

denied his request for an evidentiary hearing prior to permitting the respondent to introduce testimony from Palmese in his second habeas trial. The following additional facts are relevant to this claim.

In May, 2001, Lockery pleaded guilty to a possession of narcotics charge stemming from his March 13, 2001 arrest; Palmese was the assistant state's attorney at Lockery's plea hearing. Palmese stated the factual predicate for Lockery's charge on the record; the petitioner was not mentioned in Palmese's factual recitation. During the petitioner's first criminal trial, Lockery testified that he was arrested on March 13 for drugs that he had purchased from the petitioner. During the petitioner's first criminal trial there was no other witness who testified that Lockery was arrested for drugs that he had purchased from the petitioner.[3] At some time between the petitioner's first and second criminal trials, Lockery recanted that specific piece of testimony in a letter that, although he had not authored, he had signed and notarized. At the petitioner's second habeas trial, Lockery testified that police officers pressured him to testify during the petitioner's first criminal trial that he was arrested for drugs that he had purchased from the petitioner. Lockery did not testify at the petitioner's second criminal trial, and Canace unsuccessfully attempted to admit Lockery's recantation letter into evidence at that trial.

In addition, at the first criminal trial, Palmese failed to disclose Lockery's criminal record to the petitioner. An investigator for Palmese searched for information about Lockery in the National Crime Information Center database, which returned results indicating that Lockery did not have any criminal convictions. The search results, however, were for a different individual also named Kevin Lockery.

In his petition, the petitioner alleged that, at his first criminal trial, Palmese intentionally committed *Brady* violations by failing to disclose Lockery's criminal record, failing to disclose the disparities between the logo on the packaging of the drugs that were found on Lockery and the logo on the packaging of the drugs that were found on the petitioner and in his residence, and eliciting perjured testimony from Lockery regarding the source of the drugs leading to his March 13, 2001 arrest. In November and December, 2016, a trial on the petition was held before the court, *Sferrazza, J.*, in the judicial district of Tolland (first habeas trial).

According to an allegation made by Lori Guegel, the court reporter at the first habeas trial, an individual, later identified as Jerry Chrostowski of the New Britain Police Department, provided hand signals to Palmese during her testimony at trial. More specifically, Guegel alleged that she observed Chrostowski provide hand signals to Palmese six times during her testimony; each time Palmese would begin to answer the question asked

of her before receiving a hand signal from Chrostowski, which, it was alleged, prompted Judge Sferrazza to either interrupt her or to allow her to finish her answer before offering a different answer and the opportunity for her to amend her response to the question. In response to this allegation by Guegel, the Office of the Chief State's Attorney conducted an investigation.[4] On May 19, 2017, Judge Sferrazza declared a mistrial because more than six months had passed since he last heard evidence in the first habeas trial. On June 20, 2017, at the direction of the Office of the Chief Court Administrator, the matter was transferred to the judicial district of Fairfield and assigned to Judge Devlin.

On July 27, 2017, the petitioner filed a "motion for [an] evidentiary hearing to prohibit the testimony of . . . Palmese and . . . [Chrostowski]" as a "form of sanctioning" the respondent. In support of his motion, the petitioner relied on the allegations that were made by Guegel of hand-signaling during the first habeas trial. The petitioner argued that his suggested "sanction" was necessary because Palmese's credibility and intent were key issues in his petition, which asserted claims of intentional *Brady* violations and prosecutorial impropriety that warranted a double jeopardy bar to his further prosecution in the second criminal trial. The petitioner further argued that, even if the court declined to prohibit testimony from Palmese and Chrostowski, it should have nevertheless granted his request for an evidentiary hearing, "as it [would have] aid[ed] the court with its credibility assessment of the witnesses and assist[ed] with determining whether the *Brady* material was intentionally withheld as a continuing course of conduct in order to delay the truth." When arguing the motion to Judge Devlin, the petitioner added that he wanted "an opportunity to make a record of what allegedly happened" with the hand-signaling incident. Judge Devlin denied the motion, stating that he would not "divert these proceedings into a big trial into that issue." Judge Devlin nonetheless invited the petitioner to file a written offer of proof and stated, "you can make whatever record you want to make."

In his memorandum of decision, Judge Devlin denied the petitioner's *Brady* and double jeopardy claims. With respect to the *Brady* claims, Judge Devlin found that Lockery's criminal record was exculpatory and that its nondisclosure was unintentional and due to negligence. Judge Devlin found that Palmese did not knowingly elicit perjured testimony from Lockery when he identified the petitioner as the seller of the drugs leading to Lockery's March 13, 2001 arrest. Judge Devlin discounted Palmese's role at Lockery's May, 2001 plea hearing, which occurred several months prior to the petitioner's first criminal trial in 2002, by accepting her testimony that she "did not connect" the plea hearing and the petitioner's first criminal trial due to the high number of cases—approximately 2800—that she prose-

cuted in the judicial district of New Britain in 2001. Judge Devlin further found that the petitioner had already obtained the relief that he was entitled to for a *Brady* violation: "[O]ur Supreme Court reversed the convictions from the first [criminal] trial and remanded the case for a new trial. . . . A *Brady* violation in the first [criminal] trial would have only entitled the petitioner to a new trial. He has already received such relief, albeit on different grounds."

Judge Devlin also denied the petitioner's claim that Palmese's alleged *Brady* violations in his first criminal trial warranted a double jeopardy bar of his prosecution in the second criminal trial. Judge Devlin stated that he "accept[ed] [Palmese's] testimony that, at no time during the first [criminal] trial, were her actions motivated to prevent a likely acquittal. Moreover, the state had a strong case. The [petitioner] was caught with drugs on his person while leaving the site of what was supposed to be a drug sale. In addition, his residence contained more drugs and a shotgun."

On appeal, the petitioner argues that, as a result of Judge Devlin's denial of his request for an evidentiary hearing, "[his] judgment as to the *Brady* and double jeopardy claims is incomplete, based on an inadequate record, and fatally flawed." According to the petitioner, Palmese's intent and credibility were central to Judge Devlin's analysis of his claims (1) of intentional *Brady* violations and (2) that, as a result of prosecutorial impropriety by Palmese, his second criminal trial should have been barred by double jeopardy principles under *Oregon* v. *Kennedy*, 456 U.S. 667, 102 S. Ct. 2083, 72 L. Ed. 2d 416 (1982), and *United States* v. *Wallach*, 979 F.2d 912 (2d Cir. 1992), cert. denied, 508 U.S. 939, 113 S. Ct. 2414, 124 L. Ed. 2d 637 (1993). Moreover, according to the petitioner, the alleged hand-signaling involving Palmese during the petitioner's first habeas trial was relevant to her intent to commit *Brady* violations and her credibility as a witness in his second habeas trial. Therefore, an evidentiary hearing was necessary to explore that alleged incident. We disagree.

"[Our Supreme Court] consistently [has] held that, unless otherwise required by statute, a rule of practice or a rule of evidence, whether to conduct an evidentiary hearing generally is a matter that rests within the sound discretion of the trial court. . . . On appeal, every reasonable presumption in favor of the trial court's discretionary ruling will be made." (Citations omitted; internal quotation marks omitted.) *State* v. *Michael J.*, 274 Conn. 321, 332–33, 875 A.2d 510 (2005).

We conclude that Judge Devlin did not abuse his discretion in denying the petitioner's request for an evidentiary hearing (1) to "prohibit the testimony of . . . Palmese and . . . [Chrostowski][5] as a form of sanctioning the [respondent]" or (2) to "aid [Judge Devlin] with [his] credibility assessment of the witnesses,

and assist with determining whether the *Brady* material was intentionally withheld as a continuing course of conduct in order to delay the truth." (Footnote added.) First, as Judge Devlin recognized, Palmese was a key witness and, thus, prohibiting the respondent from calling her to testify would have been "rather draconian . . . ." Moreover, were Judge Devlin to have prohibited Palmese from testifying, he would have frustrated his ability to adjudicate the petitioner's claims with the benefit of all the salient evidence.

Second, Judge Devlin properly determined that, under the circumstances of this case, the need for an evidentiary hearing was outweighed by the time and resources that the court would have expended in order to conduct such a proceeding. See *State* v. *Michael J.*, supra, 274 Conn. 337 ("[w]e also recognize that the court reasonably could have concluded that a full evidentiary hearing into the prosecutor's off-the-record conduct would do no more than impugn [her] veracity . . . and impose a staggering burden of time and effort on our already overburdened court system" (internal quotation marks omitted)). We do not suggest that considerations of judicial economy are sufficient standing alone to justify the denial of an evidentiary hearing. See id., 337 n.8. In this case, however, Judge Devlin did not deny the petitioner's request for an evidentiary hearing without, at the same time, extending him the opportunity to develop a record that might support his alleged intentional *Brady* violations and double jeopardy claim. Judge Devlin invited the petitioner to "make whatever record you want to make." The petitioner declined. He did not call as witnesses Palmese or Chrostowski, the participants in the alleged hand-signaling scheme, or Guegel, the purported witness to the alleged hand-signaling. The petitioner failed to bring the February 2, 2017 report completed by the Office of the Chief State's Attorney to the attention of Judge Devlin. The petitioner declined to file a written offer of proof asserting the relevance of the alleged hand-signaling scheme to the claims made in his petition, despite Judge Devlin's having invited him to do so.

The petitioner argues that his case is analogous to *State* v. *Colton*, 234 Conn. 683, 663 A.2d 339 (1995), cert. denied, 516 U.S. 1140, 116 S. Ct. 972, 133 L. Ed. 2d 892 (1996). In *Colton*, the defendant was tried three times for murder; the first two trials ended in mistrials because the jury could not reach a unanimous verdict. Id., 684–85. In the third trial, the defendant was convicted of murder. Id., 685. Our Supreme Court, however, reversed that conviction and remanded the case for a new trial after concluding that the trial court had violated the defendant's constitutional right to confrontation by precluding certain evidence that showed motive and bias on the part of the state's chief witness. Id.

Following a remand of the case, the state initiated a

fourth prosecution of the defendant for murder, which the defendant moved to dismiss, arguing, inter alia, that double jeopardy barred further prosecution due to prosecutorial impropriety occurring during his third trial. Id. The trial court denied the defendant's motion to dismiss, concluding that, as a matter of law, the defendant's claim of prosecutorial impropriety could not be brought in a motion to dismiss because he had not alleged such impropriety either in a motion for a mistrial during the third trial or on appeal from his conviction at the third trial. Id., 685–86.

On appeal, our Supreme Court reversed the judgment of the trial court and remanded the case for the trial court to consider the merits of the defendant's motion to dismiss. Id., 686. The court further stated that, "[i]n order to have a fair opportunity to meet his difficult burden of proving that the prosecutor had engaged in misconduct with the intent to avoid an acquittal that was likely, the defendant must be able to bring that alleged misconduct to the attention of the court. With regard to off-the-record conduct, the proper time to do so is in a collateral evidentiary proceeding." Id., 697.

The petitioner relies on *Colton* to contend that he was entitled to a collateral evidentiary hearing because the record from his second habeas trial was bereft of evidence of the alleged hand-signaling during his first habeas trial that involved Palmese, Chrostowski, and Judge Sferrazza. In *Colton*, the defendant filed a motion to dismiss the criminal charge pending against him in his fourth criminal trial, raising the collateral issue that double jeopardy principles barred his further prosecution because of prosecutorial impropriety allegedly occurring in his third criminal trial. Id., 685. Our Supreme Court concluded that, because the evidence that the defendant intended to use to demonstrate such impropriety was not part of the record, the defendant was entitled to a collateral evidentiary hearing to uncover that evidence. Id., 696–97.

The petitioner's case is procedurally distinguishable from *Colton*. The petitioner's second habeas trial was, in part, dedicated to adjudicating the merits of his petition alleging intentional *Brady* violations in his first criminal trial and a claim that, as a result of those intentional *Brady* violations, double jeopardy principles should have barred his prosecution in the second criminal trial. The petitioner sought to prove those claims, in part, by offering evidence of Palmese's alleged participation in an improper hand-signaling scheme occurring during her testimony at his first habeas trial, which would serve as circumstantial evidence of her intent with respect to her alleged *Brady* violations during his first criminal trial. The petitioner further sought to use Palmese's alleged participation in the hand-signaling scheme to impeach her credibility as a witness during his second habeas trial. The petitioner did not require a collateral

evidentiary hearing to develop this evidence because he could have developed it in his second habeas trial. Indeed, the petitioner's second habeas trial *was* a collateral proceeding. See *Small* v. *Commissioner of Correction*, 98 Conn. App. 389, 401, 909 A.2d 533 (2006) ("a habeas corpus petition . . . is a collateral attack on a conviction"), aff'd, 286 Conn. 707, 946 A.2d 1203, cert. denied sub nom. *Small* v. *Lantz*, 555 U.S. 975, 129 S. Ct. 481, 172 L. Ed. 2d 336 (2008); see also *State* v. *Colton*, supra, 234 Conn. 697–98 (analogizing need for collateral evidentiary hearing to decide defendant's double jeopardy claim made in his motion to dismiss charge brought in his fourth criminal trial to procedural reason that ineffective assistance of counsel claims are asserted in petitions for writ of habeas corpus, which contain "evidentiary hearing[s]" (emphasis omitted)).

Moreover, as our Supreme Court emphasized in *Michael J.*, it was not its "intention [in *Colton*] to issue a mandate to trial courts that they must conduct an evidentiary hearing in every case in which a defendant claims that the prosecutor might have committed some misdeed off-the-record, particularly when, as in [*Michael J.*], *the record alone provides an adequate basis for a court's factual finding.*" (Emphasis added.) *State* v. *Michael J.*, supra, 274 Conn. 340. For similar reasons, we conclude that Judge Devlin was not required to conduct a collateral evidentiary hearing to explore the alleged hand-signaling incident occurring during the petitioner's first habeas trial. Put simply, the petitioner, as invited by Judge Devlin, could have probed the incident during his second habeas trial. To the extent that the petitioner's *Brady* and double jeopardy claims suffered from an evidentiary lacuna, the fault lies with the petitioner, who declined Judge Devlin's invitation to file an offer of proof or to "make whatever record you want to make" regarding the alleged hand-signaling scheme.

Furthermore, even if we were to determine that Judge Devlin abused his discretion in denying the petitioner's request for an evidentiary hearing, we would nevertheless conclude that his denial was harmless because any evidence developed during such an evidentiary hearing that was favorable to the petitioner would not have sufficiently benefited his *Brady* and double jeopardy claims so as to make them meritorious.

First, as Judge Devlin observed, the petitioner received all of the relief that he was entitled to for Palmese's alleged *Brady* violations.[6] The petitioner alleged *Brady* violations in his first criminal trial as a result of Palmese's nondisclosure of (1) Lockery's criminal record, (2) the fact that the drugs that were found on Lockery during his March 13, 2001 arrest were not purchased from the petitioner, as Lockery testified during the first criminal trial, and (3) the fact that the packaging of the drugs that were found on Lockery

during his arrest were stamped with a different logo than the packaging of the drugs that were found on the petitioner's person and at his residence. Even if the petitioner had proven that each of these three nondisclosures constituted a *Brady* violation, the remedy was a new trial. See, e.g., *Lapointe* v. *Commissioner of Correction*, 316 Conn. 225, 231 n.3, 112 A.3d 1 (2015) ("a new trial is required because of a *Brady* violation"). The petitioner received that relief.

The petitioner was granted a new trial after our Supreme Court reversed the judgment of conviction in his first criminal trial because he was inadequately canvassed by the trial court regarding his decision to waive counsel and to represent himself. See *State* v. *Diaz*, supra, 274 Conn. 818. At the petitioner's second criminal trial, Lockery did not testify. Accordingly, there was no testimony that Lockery's arrest on March 13, 2001, was for drugs that he had purchased from the petitioner. See footnote 3 of this opinion. Because there was no evidence presented that Lockery purchased those drugs from the petitioner, it was immaterial that they were packaged with a different logo than that reflected on the packaging of the drugs that were found on the petitioner's person when he was arrested on March 13, and in the ensuing search of his residence. Additionally, because Lockery did not testify at the second criminal trial, his criminal record possessed insignificant impeachment value. See also footnote 8 of this opinion. Therefore, we conclude that Judge Devlin's denial of the petitioner's request for an evidentiary hearing had no effect on his *Brady* claims.

Second, we conclude, as did Judge Devlin, that the petitioner could not prove his double jeopardy claim. More specifically, we conclude that, because the state presented a strong case against the petitioner, Palmese's nondisclosure of evidence to the petitioner in his first criminal trial was not motivated to prevent an acquittal that she believed at that time was likely to occur in the absence of prosecutorial impropriety.[7]

During the petitioner's first criminal trial, multiple police officers testified that Lockery, following his arrest, cooperated in organizing a drug deal with the petitioner. According to their testimony, Lockery provided the police officers with the petitioner's telephone number, which he had listed in his cellular telephone under the contact name BB, and called the petitioner at that number using an officer's telephone to organize the drug deal. Following Lockery's telephone call to the petitioner setting up the drug deal, police officers performing surveillance of the petitioner's residence observed him depart from his residence in a vehicle and travel to the designated meeting location. The petitioner arrived at the meeting location and waited for Lockery's arrival. After some time of waiting for Lockery to arrive, the petitioner began to drive away but was stopped by

police officers and searched.

During their search of the petitioner, police officers discovered twenty-five bags of heroin, $1025 in cash, and a cellular telephone that displayed received calls, including calls from the number used by Lockery to organize the drug deal. Those items, as well as information from confidential informants and police surveillance of the petitioner's residence, were used to secure a warrant to search the petitioner's residence. A search pursuant to that warrant was executed on the petitioner's residence in the early morning hours of March 14, 2001, which led to the discovery of 168 bags of heroin, sixteen grams of marijuana, a twelve gauge shotgun, shotgun shells, and drug paraphernalia.

In light of the foregoing evidence, which overwhelmingly supported the petitioner's convictions, we conclude that it is unlikely that Palmese would have believed during the first criminal trial that the petitioner was likely to secure an acquittal in the absence of her alleged intentional *Brady* violations. Moreover, other than Lockery, no witness testified during the first criminal trial that he was arrested for possession of narcotics that he had purchased from the petitioner. The testifying police officers stated that Lockery cooperated with their investigation of the petitioner after he was arrested for possession of narcotics, but they never stated that the drugs for which he was arrested and his cooperation with their investigation were connected. Thus, the source of the drugs leading to Lockery's arrest was of minimal relevance to the charges that the petitioner faced.

In addition, Palmese did not charge the petitioner with any crimes related to the drugs that were discovered on Lockery. Therefore, even if Lockery had committed perjury regarding the source of the drugs that were found on him prior to his arrest, we conclude from our review of the record that Palmese would not have suborned that perjury in light of the strength of the state's case against the petitioner, the minimal relevance of the source of the drugs that were found on Lockery, and the lack of charges brought against the petitioner that were related to those drugs.[8] See *United States* v. *Pavloyianis*, 996 F.2d 1467, 1474–75 (2d Cir. 1993) (The court rejected the defendant's claim "that the prosecutor engaged in misconduct with the intention of avoiding what he viewed as a likely acquittal" because "[t]he evidence against [him] was strong enough so that the government had every reason to anticipate a conviction, even had [a witness'] perjury about matters collateral to [the defendant's] guilt been fully disclosed. [The witness'] testimony had been corroborated by significant independent evidence . . . ."); *United States* v. *Wallach*, supra, 979 F.2d 916–17 (concluding that "it is entirely unrealistic to think that the prosecution at [the defendant's] trial apprehended an acquittal"

because "[t]he evidence against [him] and his [codefendants] was quite strong," "[t]he prosecution had every reason to anticipate a conviction," and "[t]here was no determination that the prosecutors had actual knowledge" of witness' perjury).

Because of the considerable strength of the evidence against the petitioner at his first criminal trial, we further conclude that any evidence elicited during an evidentiary hearing on the alleged hand-signaling incident that revealed Palmese's intent to commit *Brady* violations or damaged her credibility as a witness would not have meaningfully enhanced the merits of his double jeopardy claim. See *United States* v. *Pavloyianis*, supra, 996 F.2d 1475 (rejecting defendant's contention "that an evidentiary hearing is required for [a] determination of prosecutorial intent" because "[n]o rule of law requires a hearing in this sort of case *where the relevant facts can be ascertained from the record*" and court's review of record satisfied it that "there was not the slightest indication or evidence that the trial prosecutor anticipated an acquittal" (emphasis added; internal quotation marks omitted)).

Accordingly, we conclude that the habeas court did not abuse its discretion in denying the petition for certification to appeal on the ground that it had improperly denied the petitioner's request for an evidentiary hearing.

II

The petitioner next claims that the court improperly denied his ineffective assistance of counsel claim. The petitioner argues that during his second criminal trial, Canace maintained a conflict of interest and performed deficiently. We disagree.

The following additional facts, found by the habeas court, are relevant to this claim. During his second criminal trial, the petitioner was represented by Canace. Canace served as a special public defender representing indigent criminal defendants in, inter alia, the judicial district of New Britain. While representing the petitioner, Canace was employed as a police officer for the city of New Haven. The petitioner was not aware that Canace was employed as a New Haven police officer, and Canace did not inform him of that fact. Before Canace began representing criminal defendants in approximately 1996 or 1997, Canace made known to the New Haven Police Department his desire to do so. To determine whether it was appropriate for Canace to be employed as a New Haven police officer while simultaneously representing criminal defendants, corporation counsel for the city of New Haven solicited opinions on the matter from the American Bar Association, the Statewide Grievance Committee, and the New Haven state's attorney's office. Corporation counsel concluded that Canace could represent criminal defen-

dants in Connecticut courts, with the exception of those located in the judicial district of New Haven.

Canace did not believe that his representation of the petitioner in New Britain while employed as a New Haven police officer violated rule 1.7 (a) of the Rules of Professional Conduct, which provides in relevant part that "a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if: (1) the representation of one client will be directly adverse to another client; or (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibility to another client, a former client or a third person or by a personal interest of the lawyer." Nor did Canace believe that General Statutes § 54-1f (b),[9] which authorizes police officers to make arrests of persons under certain circumstances, created a conflict of interest. Accordingly, Canace did not deem it necessary to inform the petitioner of his employment as a New Haven police officer while he represented him in his second criminal trial. See Rules of Professional Conduct 1.7 (b) (4).

In 2006, Preston Tisdale, an attorney employed as the director of the special public defender program at the Division of Public Defender Services, was informed that Canace was employed as a New Haven police officer while also representing criminal defendants as a special public defender. Tisdale consulted with the Office of the Chief Public Defender and, ultimately, decided that Canace would have to resign as a special public defender. Tisdale provided two reasons for his decision: (1) Canace exhibited a lack of candor in his application for a special public defender contract by vaguely describing his position for the city of New Haven as a " 'municipal employee,' " and (2) other clients of Canace might raise ineffective assistance of counsel claims against him.

In his petition, the petitioner alleged that Canace had a conflict of interest as a result of his employment as a police officer while representing the petitioner. The petitioner further alleged that Canace's conflict of interest presented itself when he failed (1) to move to dismiss the petitioner's criminal charges on double jeopardy grounds, (2) to identify false statements by police officers in the search warrant affidavit, and (3) to adequately cross-examine police officers regarding their prior inconsistent statements and the different logos on the packaging of the drugs seized from the petitioner and those on Lockery's person during his arrest. The petitioner also alleged particular instances in which Canace provided deficient performance at his second criminal trial.

Judge Devlin rejected the petitioner's claim that Canace had a conflict of interest, stating that "[t]here was no evidence offered that . . . Canace's represen-

tation of the petitioner was directly adverse to another client" and that he did "not find that . . . Canace's representation of the petitioner was limited by his responsibilities to the New Haven [P]olice [D]epartment." Judge Devlin further concluded that Canace did not provide the petitioner with deficient representation during his second criminal trial.

We begin by setting forth the applicable standard of review and principles of law. "Although the underlying historical facts found by the habeas court may not be disturbed unless they were clearly erroneous, whether those facts constituted a violation of the petitioner's rights under the sixth amendment is a mixed determination of law and fact that requires the application of legal principles to the historical facts of this case. . . . As such, that question requires plenary review by this court unfettered by the clearly erroneous standard. . . .

"It is axiomatic that the right to counsel is the right to the effective assistance of counsel. . . . As an adjunct to this right, a criminal defendant is entitled to be represented by an attorney free from conflicts of interest. . . .

"Different standards apply to different types of claims of ineffective assistance of counsel. Where the criminal defendant presents a claim of actual ineffectiveness . . . that is, when he challenges his lawyer's performance in the trial court, he must show that: (1) his counsel's performance was deficient in the sense that the counsel made errors so serious that counsel was not functioning as the counsel guaranteed by the [s]ixth [a]mendment; and (2) the deficient performance prejudiced the defense . . . in the sense that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. . . . In such a case, therefore, the defendant must establish (1) deficient performance, and (2) actual prejudice.

"Where, however, the defendant claims that his counsel was burdened by an actual conflict of interest . . . the defendant need not establish actual prejudice. . . . Where there is an actual conflict of interest, prejudice is presumed because counsel [has] breach[ed] the duty of loyalty, perhaps the most basic of counsel's duties. Moreover, it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests. . . . In a case of a claimed conflict of interest, therefore, in order to establish a violation of the sixth amendment the defendant has a two-pronged task. He must establish (1) that counsel actively represented conflicting interests and (2) that an actual conflict of interest adversely affected his lawyer's performance." (Citations omitted; internal quotation marks omitted.) *Phillips* v. *Warden*, 220 Conn. 112, 131–33, 595 A.2d 1356 (1991).

"An actual conflict of interest is more than a theoretical conflict. The United States Supreme Court has cautioned that the possibility of conflict is insufficient to impugn a criminal conviction. . . . A conflict is merely a *potential* conflict of interest if the interests of the defendant may place the attorney under inconsistent duties at some time in the future. . . . To demonstrate an actual conflict of interest, the petitioner must be able to point to *specific instances* in the record which suggest impairment or compromise of his interests for the benefit of another party. . . . A mere theoretical division of loyalties is not enough. . . . If a petitioner fails to meet that standard, for example, where only a potential conflict of interest has been established, prejudice will not be presumed, and the familiar [prongs of *Strickland* v. *Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)] will apply." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Anderson* v. *Commissioner of Correction*, 127 Conn. App. 538, 550, 15 A.3d 658 (2011), aff'd, 308 Conn. 456, 64 A.3d 325 (2013).

On appeal, the petitioner argues that "Canace's conflict and his deficient performance were linked, the former causing the latter and both causing prejudice," and that the court improperly failed "to find either the conflict alleged in count three or the deficient performance alleged in count four . . . ." The petitioner asserts that Canace had an actual conflict of interest during his representation of the petitioner because his employment as an active duty police officer divided his loyalty. The petitioner calls to our attention specific instances in the record that demonstrate Canace's conflict of interest and his deficient performance. "Canace failed to point out that Chrostowski was inconsistent and, thus, unreliable on multiple points, including where narcotics were supposedly found in [the] petitioner's home and when he first saw them. Canace further failed to point out that Chrostowski said the police were familiar with [the petitioner] whereas [another officer] said he did not know him. Critically, as this whole situation began with Lockery, Chrostowski was inconsistent between trials about whether Lockery bought drugs from [the] petitioner."

We reject the petitioner's ineffective assistance of counsel claim because he does not provide us with any law, and we are aware of none, that holds that Canace's simultaneous representation of the petitioner and employment as a New Haven police officer categorically establishes an actual conflict of interest. See *Paradis* v. *Arave*, 130 F.3d 385, 391 (9th Cir. 1997) (concluding that employment of petitioner's defense counsel as city park police officer when he was appointed to represent petitioner fell "short of a constitutional violation because there is no showing that [counsel] *actively represented* conflicting interests," and "[p]otentially

divided allegiances do not constitute active representation of conflicting interests" (emphasis in original)); *State* v. *Gonzales*, 483 So. 2d 1236, 1236–37 (La. App. 1986) (requiring defendant alleging that his defense counsel had actual conflict as result of his role as reserve police officer to demonstrate how that alleged conflict adversely affected defense counsel's performance); cf. *People* v. *Washington*, 101 Ill. 2d 104, 108–109, 113, 461 N.E.2d 393 (concluding that defendant was denied effective assistance of counsel after finding actual conflict of interest because defense counsel, who served as part-time city attorney for Chicago Heights, "was obliged to cross-examine and attempt to discredit" Chicago Heights police officer at pretrial hearing), cert. denied, 469 U.S. 1022, 105 S. Ct. 442, 83 L. Ed. 2d 367 (1984); see also *State* v. *Parrott*, 262 Conn. 276, 287, 811 A.2d 705 (2003) ("[i]n the absence of an affirmative duty by the trial court to inquire [with respect to a conflict of interest] . . . a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance in order to obtain reversal of his conviction").

Moreover, the petitioner fails to direct our attention to where in the record we could find "specific instances . . . which suggest impairment or compromise of his interests for the benefit of another party"; (emphasis omitted; internal quotation marks omitted) *Anderson* v. *Commissioner of Correction*, supra, 127 Conn. App. 550; or "errors so serious that counsel was not functioning as the counsel guaranteed by the [s]ixth [a]mendment . . . ." (Internal quotation marks omitted.) *Phillips* v. *Warden*, supra, 220 Conn. 132. Canace's failure to cross-examine Chrostowski as to where, precisely, the police officers discovered the drugs in the petitioner's residence and when he first saw them neither demonstrates a compromise of Canace's loyalty to the petitioner nor an error so serious that he was not functioning as counsel guaranteed under the sixth amendment to the United States constitution. Chrostowski testified in the second criminal trial that, although he was present at the petitioner's residence while it was being searched pursuant to a warrant, he did not partake in the search because he was responsible for monitoring Michelle Gross, an individual residing at the petitioner's residence during the search. Accordingly, because Chrostowski was capable of providing a rational explanation for these slight inconsistencies in his testimony, it was reasonable for Canace not to pursue this avenue of discrediting his testimony. *Strickland* v. *Washington*, supra, 466 U.S. 687–88 ("[w]hen a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of *reasonableness*" (emphasis added)). Similarly, Canace's failure to point out that Chrostowski had testified that the police officers were familiar with

the petitioner, despite another police officer testifying that he did not know the petitioner, would have been of negligible impeachment value.

Last, the petitioner argues that Canace should have cross-examined Chrostowski regarding inconsistencies in his testimony during the first and second criminal trials regarding the source of the drugs that were found on Lockery. This argument is belied by our review of the records from the first and second criminal trials, which reveal that Chrostowski did not testify that the drugs found on Lockery were purchased from the petitioner. See footnote 3 of this opinion. In addition, in the second criminal trial, Canace asked the investigating police officers whether the location where Lockery was arrested on March 13, 2001, had any relation to the petitioner or their investigation of the petitioner. With this line of questioning, Canace seemingly sought to alert the jury to the fact that the petitioner had no involvement with the drugs that were found on Lockery. Considering that the petitioner was facing multiple narcotics charges, it was a reasonable defense strategy for Canace to highlight for the jury the petitioner's lack of involvement with the drugs that were found on Lockery. See id. Had Canace attempted to expose any perceived inconsistencies in Chrostowski's testimony regarding the source of the drugs that were discovered on Lockery, he may have distracted the jury from reaching the conclusion that he desired: that the petitioner did not sell Lockery the drugs that led to Lockery's March 13 arrest.[10]

The petitioner also argues that, pursuant to § 54-1f (b), Canace was obligated to arrest the petitioner if he had reasonable grounds to suspect that the petitioner had committed a felony crime. According to the petitioner, this "statutory mandate" to Canace created an actual conflict of interest. Even if we agreed with the petitioner's construction of § 54-1f (b) that it *required* police officers to arrest persons when they have reasonable grounds to suspect those persons had committed felony crimes, the petitioner has not directed us to any "specific instance" in which this statute, or any other legal obligation of Canace as a New Haven police officer, impaired Canace's ability to provide the petitioner with adequate and uncompromised defense representation. See *Anderson* v. *Commissioner of Correction*, supra, 127 Conn. App. 550 ("[t]o demonstrate an actual conflict of interest, the petitioner must be able to point to *specific instances* in the record which suggest impairment or compromise of his interests for the benefit of another party" (emphasis in original; internal quotation marks omitted)). Accordingly, we reject this argument as well.[11]

We conclude that the habeas court did not abuse its discretion in denying the petition for certification to appeal on the ground that the court improperly denied

the petitioner's ineffective assistance of counsel claim.

The appeal is dismissed.

In this opinion the other judges concurred.

* The listing of judges reflects their seniority status on this court as of the date of oral argument.

[1] In the fifth count of his petition, the petitioner alleged ineffective assistance by his appellate counsel in the direct appeal from the judgment of conviction in his second criminal trial, a claim which the habeas court denied. On appeal, the petitioner did not claim that the court's denial was erroneous and, therefore, we do not discuss the fifth count any further in this opinion.

[2] For reasons that will be set forth in part I of this opinion, the trial before Judge Devlin was the petitioner's second habeas trial.

[3] In his memorandum of decision, Judge Devlin found that, "[i]n the first [criminal] trial, [Detective Jerry Chrostowski] testified that Lockery was arrested for possession of narcotics and agreed to help the police get his supplier, namely, the petitioner. In the second [criminal] trial, he testified that Lockery was arrested for possessing two bags of drugs and the purchase of those drugs had nothing to do with the petitioner." Further on in his analysis, Judge Devlin stated that "[w]hile Chrostowski was clearly inconsistent regarding where Lockery obtained the drugs he was caught with, there was no sense in disturbing the testimony at the second [criminal] trial that they were not connected to the [petitioner]." Chrostowski did testify in the first criminal trial that Lockery offered to provide information on a supplier of his, and that the petitioner was a supplier of his. We disagree, however, that this testimony supports the finding that Chrostowski testified at the first criminal trial that Lockery was arrested on March 13 for drugs that he had purchased from the petitioner. Chrostowski was not asked whether the petitioner was the particular supplier of the drugs for which Lockery was arrested on March 13, and did not testify to that effect.

[4] A February 2, 2017 report was completed following the investigation. The petitioner did not bring the report to the attention of Judge Devlin either in his July 27, 2017 motion for an evidentiary hearing or when arguing that motion on July 27, 2017. The petitioner also failed to offer the report as an exhibit during his second habeas trial.

[5] The respondent did not call Chrostowski as a witness during the second habeas trial.

[6] Judge Devlin found that Lockery's criminal record was exculpatory. See *State* v. *McIntyre*, 242 Conn. 318, 323, 699 A.2d 911 (1997) ("[i]t is well established that . . . exculpatory evidence falls within *Brady*'s definition of evidence favorable to an accused" (internal quotation marks omitted)). He did not, however, state whether he found that the criminal record was material. See id. ("[t]o prevail on a *Brady* claim, the defendant bears a heavy burden to establish: (1) that the prosecution suppressed evidence; (2) that the evidence was favorable to the defense; and (3) that it was material" (internal quotation marks omitted)); id. ("The test of materiality of nondisclosed exculpatory evidence requires that there be a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (Internal quotation marks omitted.)).

[7] "Ordinarily, the [d]ouble [j]eopardy [c]lause imposes no limitation upon the power of the government to retry a defendant who has succeeded in persuading a court to set his conviction aside, unless the conviction has been reversed because of insufficiency of the evidence. *Oregon* v. *Kennedy*, supra, 456 U.S. 676 n.6. In *Kennedy*, however, the United States Supreme Court held that double jeopardy also bars a subsequent prosecution if there was prosecutorial misconduct in the first trial that goaded the defendant into seeking a mistrial. . . . The United States Court of Appeals for the Second Circuit recently held, however, that prosecutorial misconduct may be a bar to a second trial even if there was no mistrial in the first case. . . . The court in [*United States* v. *Wallach*, supra, 979 F.2d 916] held that [i]f any extension of *Kennedy* beyond the mistrial context is warranted, it would be a bar to retrial only where the misconduct of the prosecutor is undertaken, not simply to prevent an acquittal, but *to prevent an acquittal that the prosecutor believed at the time was likely to occur in the absence of his [or her] misconduct*." (Citations omitted; emphasis added; internal quotation marks omitted.) *State* v. *Colton*, supra, 234 Conn. 691–93; see also id., 696 ("we agree with the [United States Court of Appeals for the Second

Circuit] that *Kennedy* logically should be extended to bar a new trial, even in the absence of a mistrial or reversal because of prosecutorial misconduct, if the prosecutor in the first trial engaged in misconduct with the intent 'to prevent an acquittal that the prosecutor believed at the time was likely to occur in the absence of his [or her] misconduct' ").

[8] For the same reasons, we conclude that Palmese did not intentionally withhold information regarding the difference between the logos on the packaging of the drugs that were discovered on Lockery and the drugs that were found on the petitioner's person and at his residence out of any belief at that time that such an action was necessary to avoid the petitioner's likely acquittal.

Furthermore, even if Palmese knew that an incorrect criminal record for Lockery was provided to the petitioner and intentionally withheld Lockery's actual criminal record from the petitioner, we nevertheless conclude that that criminal record was of little additional impeachment value in light of the fact that the jury knew that Lockery was arrested for possession of narcotics on March 13, 2001, and had cooperated with police officers' investigation of the petitioner in exchange for leniency. *State* v. *Diaz*, supra, 109 Conn. App. 522. Thus, any further impeachment value that the petitioner would have gained by virtue of possessing Lockery's actual criminal record would have been inconsiderable compared to the weight of the evidence that the state presented against him.

[9] General Statutes § 54-1f (b) provides: "Members of the Division of State Police within the Department of Emergency Services and Public Protection or of any local police department or any chief inspector or inspector in the Division of Criminal Justice shall arrest, without previous complaint and warrant, any person who the officer has reasonable grounds to believe has committed or is committing a felony."

[10] In his petition and at the second habeas trial, the petitioner asserted other instances that allegedly constituted manifestations of Canace's conflict of interest or his deficient performance during the second criminal trial. In his brief on appeal, however, the petitioner did not discuss those instances when providing analysis of his claim of an actual conflict or deficient performance. Therefore, we do not consider them in this appeal. See *Raynor* v. *Commissioner of Correction*, 117 Conn. App. 788, 796–97, 981 A.2d 517 (2009) ("[R]eviewing courts are not required to review issues that have been improperly presented to th[e] court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly." (Internal quotation marks omitted.)), cert. denied, 294 Conn. 926, 986 A.2d 1053 (2010); see also *Collins* v. *Goldberg*, 28 Conn. App. 733, 738, 611 A.2d 938 (1992) (failure to brief certain claims set forth in complaint constituted abandonment of claims).

[11] Because we conclude that the petitioner failed to prove that Canace actively represented conflicting interests; *Phillips* v. *Warden*, supra, 220 Conn. 133; *Anderson* v. *Commissioner of Correction*, supra, 127 Conn. App. 550; and performed deficiently at the petitioner's second criminal trial, we do not reach the second prong of *Strickland*. See *Phillips* v. *Warden*, supra, 132.

———————————————————