DANIEL DIAZ *v.* COMMISSIONER OF CORRECTION
(SC 20536)

Robinson, C. J., and McDonald, D'Auria,
Mullins, Kahn and Ecker, Js.

*Syllabus*

Pursuant to statute (§ 54-1f (b)), a police officer "shall arrest, without previ-
ous complaint and warrant, any person who the officer has reasonable
grounds to believe has committed or is committing a felony."

Diaz *v.* Commissioner of Correction

The petitioner, who had been convicted of various drug and weapons
charges, sought a writ of habeas corpus, claiming, inter alia, that his
trial counsel, C, had rendered ineffective assistance. The petitioner spe-
cifically alleged that C had a conflict of interest insofar as he was
employed as an active duty New Haven police officer while simultane-
ously representing the petitioner in criminal proceedings in the judicial
district of New Britain. Before C began representing criminal defendants,
he sought the advice of corporation counsel for the city of New Haven,
who concluded that C's representation of criminal defendants was not
inappropriate, so long as it occurred outside of the New Haven judicial
district. In his habeas petition, the petitioner alleged, inter alia, that C
failed to disclose his employment as a police officer to him and that,
as a result of this conflict of interest, C failed to adequately cross-
examine the New Britain police officers who arrested the petitioner and
searched his apartment. The habeas court denied the petition, conclud-
ing, inter alia, that there was no evidence that C's representation of
the petitioner was directly adverse to another client or limited by C's
responsibilities to the New Haven Police Department. Specifically, the
court implicitly agreed with and credited C's view that his obligations
as a police officer under § 54-1f (b) did not give rise to a conflict of
interest when he represented criminal defendants in locales other than
New Haven. Thereafter, the petitioner filed a petition for certification
to appeal, which the habeas court denied, and the petitioner appealed
to the Appellate Court, which dismissed the petitioner's appeal. On the
granting of certification, the petitioner appealed to this court. *Held*:

1. This court declined the respondent's invitation to revisit the question of
   which standard applies to ineffective assistance of counsel claims based
   on personal conflicts of interest that do not involve the concurrent
   representation of multiple clients: because the petitioner could not pre-
   vail under the standard currently followed by this court, as articulated
   in *Cuyler* v. *Sullivan* (446 U.S. 335), which requires a petitioner to
   establish, inter alia, that an actual conflict of interest adversely affected
   defense counsel's performance, it was not necessary for this court to
   consider whether it should instead follow the majority of federal courts
   of appeals that have concluded that the more stringent standard set
   forth in *Strickland* v. *Washington* (466 U.S. 668), which requires a
   petitioner to establish that there is a reasonable probability that, but
   for the attorney's deficient performance, the result of the proceeding
   would have been different, applies in habeas cases involving purely
   personal conflicts of interest.

2. The petitioner could not prevail on his claim that it is a per se conflict
   of interest for an individual to simultaneously serve as a Connecticut
   police officer and to represent a criminal defendant, even if the alleged
   crimes were committed, investigated, and prosecuted outside of the city
   or town in which the officer serves: although the use of the phrase
   "shall arrest" in § 54-1f (b) suggested, as the petitioner argued, that

Diaz *v.* Commissioner of Correction

police officers have a mandatory and nondiscretionary duty to arrest all suspected felons under all circumstances, regardless of when or where the suspected crime was committed, the petitioner's interpretation was not the only plausible reading of the statutory language; moreover, adopting the petitioner's interpretation of § 54-1f (b) would lead to absurd and unworkable results insofar as treating the statute as mandatory would deprive police officers of the necessary discretion as to whether and when to arrest a suspected felon and would require them to make arrests, even when the suspected crime was committed long ago, outside of the statute of limitations, or outside of the officer's jurisdiction; accordingly, this court concluded that, although § 54-1f (b) gives patrolling officers the authority to arrest suspected felons they encounter, it does not require off duty officers, such as C, to arrest their clients whenever they suspect that those clients may have committed other crimes, even outside of the officer's jurisdiction; nevertheless, because the petitioner raised a colorable question of statutory interpretation that previously had not been directly addressed by the appellate courts of this state, this court concluded that the habeas court had abused its discretion in denying the petition for certification to appeal, and, accordingly, the Appellate Court improperly dismissed the petitioner's appeal from that denial.

3. There was no merit to the petitioner's claim that C's undisclosed status as a police officer became an actual conflict of interest during the petitioner's criminal trial insofar as it led C to hold back when cross-examining other police officers; the habeas court thoroughly analyzed the petitioner's claims of inadequate cross-examination and found them to be without merit, the Appellate Court reviewed the petitioner's challenges to the findings and conclusions of the habeas court and found them to be meritless, and this court saw no reason to second-guess the habeas court's determination that there was no constitutionally relevant actual conflict of interest because the petitioner was unable to establish prejudice under *Sullivan* by showing that C had failed to pursue some plausible, alternative defense strategy or tactic that was inherently in conflict with or not undertaken due to C's other loyalties; nevertheless, this court emphasized that, although the petitioner did not demonstrate an actual conflict of interest, it did not condone C's failure to disclose to the petitioner that he was also employed as a police officer or C's decision to mislead the Office of the Chief Public Defender by vaguely listing his employment with New Haven as a "municipal employee," rather than as a police officer, on his application for a special public defender contract, which were unbecoming of an officer of the court.

(*Two justices concurring in one opinion*)

Argued December 17, 2021—officially released August 16, 2022

*Procedural History*

Amended petition for a writ of habeas corpus, brought to the Superior Court in the judicial district

Diaz *v.* Commissioner of Correction

of Tolland and transferred to the judicial district of
Fairfield, where the case was tried to the court, *Devlin,
J.*; judgment denying the petition; thereafter, the court
denied the petition for certification to appeal, and the
petitioner appealed to the Appellate Court, *DiPentima,
C. J.*, and *Alvord* and *Keller, Js.*, which dismissed the
appeal, and the petitioner, on the granting of certifica-
tion, appealed to this court. *Improper form of judg-
ment*; *reversed*; *judgment directed.*

*Robert L. O'Brien*, assigned counsel, with whom, on
the brief, was *Christopher Y. Duby*, assigned counsel,
for the appellant (petitioner).

*Mitchell S. Brody*, senior assistant state's attorney,
with whom, on the brief, were *Brian W. Preleski*, former
state's attorney, and *Angela R. Macchiarulo*, senior
assistant state's attorney, for the appellee (respondent).

*Opinion*

MULLINS, J. The petitioner, Daniel Diaz, appeals
from the judgment of the Appellate Court dismissing
his appeal from the judgment of the habeas court. The
primary issue on appeal is whether the habeas court
abused its discretion by denying his petition for certifi-
cation to appeal with respect to the claim that his
defense counsel at his second criminal trial rendered
ineffective assistance of counsel by laboring under a
conflict of interest, namely, simultaneously working as
defense counsel and as an active duty police officer in
a different city. Although counsel's failure to disclose
the potential conflict to the petitioner is deeply trou-
bling, and although we conclude that the legal issues
raised are fairly debatable among jurists of reason, such
that certification to appeal should have been granted,
we ultimately agree with the respondent, the Commis-
sioner of Correction, that the petitioner failed to prove
his claim that his counsel labored under an actual con-
flict of interest.

344 Conn. 365 AUGUST, 2022 369

Diaz *v.* Commissioner of Correction

I

The opinion of the Appellate Court sets forth the following relevant facts and procedural history. See *Diaz* v. *Commissioner of Correction*, 200 Conn. App. 524, 526–29, 545–47, 240 A.3d 795 (2020). "In early 2001, the [petitioner] was under investigation by the New Britain [P]olice [D]epartment for illegal drug related activities. On March 13, 2001, New Britain police officers arrested Kevin Lockery, who was known by the police as a drug user, for a narcotics offense. In an effort to gain lenient treatment, Lockery identified the [petitioner] as a drug dealer and provided the police with information about the [petitioner]. At the direction of the police, Lockery called the [petitioner] on a [cell phone] and arranged to purchase five bags of heroin at a specific location in New Britain. Shortly after the [petitioner] received Lockery's call, the [petitioner] left his residence and drove to that location. Lockery did not meet the [petitioner] as arranged, and, after several minutes, the [petitioner] began to drive away.

"Police officers stopped the [petitioner's] automobile. A search of the [petitioner] yielded twenty-five packets of heroin, $1025 and a [cell] phone that displayed among received calls the telephone number from which Lockery had called the [petitioner] to arrange the drug purchase. A subsequent search of the [petitioner's] residence, pursuant to a warrant, yielded 168 packets of heroin, [16] grams of marijuana, a [12] gauge shotgun, several shotgun shells and numerous other items typically used in the sale and distribution of illegal drugs. . . .

"In his first criminal trial in 2002, the petitioner was found guilty by a jury of having committed multiple charged offenses, but the judgment of conviction was reversed by [this court] because the petitioner had received an inadequate canvass from the trial court regarding his decision to waive counsel and [to] repre-

Diaz *v.* Commissioner of Correction

sent himself. See *State* v. *Diaz*, 274 Conn. 818, 828, 878 A.2d 1078 (2005). In his second criminal trial in 2006, the petitioner was found guilty by a jury of [one count of] possession of narcotics with intent to sell by a person who is not drug-dependent in violation of General Statutes [Rev. to 2001] § 21a-278 (b), two counts of possession of narcotics in violation of General Statutes [Rev. to 2001] § 21a-279 (a), and [one count of] criminal possession of a firearm in violation of General Statutes [Rev. to 2001] § 53a-217 (a) (1). [The Appellate Court] affirmed the judgments of conviction on appeal. See *State* v. *Diaz*, [109 Conn. App. 519, 559, 952 A.2d 124, cert. denied, 289 Conn. 930, 958 A.2d 161 (2008)].'' (Citation omitted; internal quotation marks omitted.) *Diaz* v. *Commissioner of Correction*, supra, 200 Conn. App. 526–27.

''[In] . . . 2015, the petitioner . . . filed an amended petition for a writ of habeas corpus, which is the operative petition in this appeal. The petition contained five counts, only [one] of which [is] relevant to this appeal.'' Id., 528. ''In the third count, the petitioner alleged that Frank Canace, his defense counsel in the second criminal trial, had a conflict of interest as a result of his employment as a New Haven police officer while representing the petitioner as a special public defender.'' Id.

The petitioner alleged that ''Canace served as a special public defender representing indigent criminal defendants in . . . the judicial district of New Britain. While representing the petitioner, Canace was employed as a police officer for the city of New Haven. The petitioner was not aware that Canace was employed as a New Haven police officer, and Canace did not inform him of that fact.'' Id., 545.

''Before Canace began representing criminal defendants in approximately 1996 or 1997, Canace [had] made

Diaz *v.* Commissioner of Correction

known to the New Haven Police Department his desire to do so. To determine whether it was appropriate for Canace to be employed as a New Haven police officer while simultaneously representing criminal defendants, corporation counsel for the city of New Haven solicited opinions on the matter from the American Bar Association, the Statewide Grievance Committee, and the New Haven state's attorney's office. Corporation counsel concluded that Canace could represent criminal defendants in Connecticut courts, with the exception of those located in the judicial district of New Haven.'' Id., 545–46.

"In 2006, Preston Tisdale, an attorney employed as the director of the special public defender program at the Division of Public Defender Services, was informed that Canace was employed as a New Haven police officer while also representing criminal defendants as a special public defender. Tisdale consulted with the Office of the Chief Public Defender and, ultimately, decided that Canace would have to resign as a special public defender. Tisdale provided two reasons for his decision: (1) Canace exhibited a lack of candor in his application for a special public defender contract by vaguely describing his position for the city of New Haven as a municipal employee, and (2) other clients of Canace might raise ineffective assistance of counsel claims against him.

"In his petition, the petitioner alleged that Canace had a conflict of interest as a result of his employment as a police officer while representing the petitioner. The petitioner further alleged that Canace's conflict of interest presented itself when he failed (1) to move to dismiss the petitioner's criminal charges on double jeopardy grounds, (2) to identify false statements by police officers in the search warrant affidavit, and (3) to adequately cross-examine police officers regarding their prior inconsistent statements and the different

Diaz *v.* Commissioner of Correction

logos on the packaging of the drugs seized from the petitioner and those on Lockery's person during his arrest. The petitioner also alleged particular instances in which Canace provided deficient performance at [the petitioner's] second criminal trial.'' (Internal quotation marks omitted.) Id., 546–47.

A trial on the habeas petition was held in 2017. Id., 529. The habeas court denied each of the petitioner's claims. Id. With respect to the claim that Canace labored under an actual conflict of interest, the court found no evidence that ''Canace's representation of the petitioner was directly adverse to another client'' or that it was ''limited by his responsibilities to the New Haven Police Department.'' Among other things, the habeas court implicitly agreed with and credited Canace's view that his obligations as a police officer under General Statutes § 54-1f (b)[1] did not give rise to a conflict of interest when he represented criminal defendants in other locales. Ultimately, the habeas court determined that Canace's representation of the petitioner was not limited by his responsibilities to the New Haven Police Department.

Thereafter, the petitioner filed a petition for certification to appeal from the denial of his petition for a writ of habeas corpus, which the habeas court denied. See *Diaz* v. *Commissioner of Correction*, supra, 200 Conn. App. 529. The petitioner then appealed to the Appellate Court, and that court dismissed the appeal, finding no merit to the petitioner's claims. See id., 554. This certified appeal followed.[2] Additional facts will be set forth as necessary.

[1] The text of the statute is set forth in part II B 1 of this opinion.

Moreover, although § 54-1f (b) was the subject of technical amendments in 2011; see Public Acts 2011, No. 11-51, § 134; those amendments have no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision of the statute.

[2] We granted certification to appeal, limited to the following question: ''Did the Appellate Court properly reject the petitioner's claim that the habeas court had abused its discretion by denying his petition for certification to appeal with respect to the claim that defense counsel at his second criminal

344 Conn. 365 AUGUST, 2022 373

Diaz *v.* Commissioner of Correction

II

A

The following legal principles govern our resolution of the petitioner's appeal. "We begin by setting forth the applicable standard of review. The habeas court is afforded broad discretion in making its factual findings, and those findings will not be disturbed unless they are clearly erroneous. . . . The application of [the pertinent legal standard to] the habeas court's factual findings . . . however, presents a mixed question of law and fact, which is subject to plenary review. . . .

"Faced with the habeas court's denial of certification to appeal, a petitioner's first burden is to demonstrate that the habeas court's ruling constituted an abuse of discretion. . . . A petitioner may establish an abuse of discretion by demonstrating that the issues are debatable among jurists of reason . . . [the] court could resolve the issues [in a different manner] . . . or . . . the questions are adequate to deserve encouragement to proceed further. . . . The required determination may be made on the basis of the record before the habeas court and the applicable legal principles. . . . If the petitioner succeeds in surmounting that hurdle, the petitioner must then demonstrate that the judgment of the habeas court should be reversed on its merits. . . . In determining whether the habeas court abused its discretion in denying the petitioner's request for certification, we necessarily must consider the merits of

trial rendered ineffective assistance by failing to disclose his role as an active police officer in the state of Connecticut?'' *Diaz* v. *Commissioner of Correction*, 335 Conn. 971, 971–72, 241 A.3d 129 (2020). The respondent contends, and we agree, that the issue is more properly characterized as whether defense counsel rendered ineffective assistance due to an actual conflict of interest arising from his simultaneous role as an active police officer in the state of Connecticut. See, e.g., *Gomez* v. *Commissioner of Correction*, 336 Conn. 168, 174–75 n.3, 243 A.3d 1163 (2020) (this court may restate certified question).

Diaz *v.* Commissioner of Correction

the petitioner's underlying claims to determine whether the habeas court reasonably determined that the petitioner's appeal was frivolous.'' (Citation omitted; internal quotation marks omitted.) *Moore* v. *Commissioner of Correction*, 338 Conn. 330, 338–39, 258 A.3d 40 (2021); see also *Simms* v. *Warden*, 230 Conn. 608, 612, 615–16, 646 A.2d 126 (1994). Certification to appeal should be granted when, for example, the appeal presents colorable issues of first impression in Connecticut appellate courts. See, e.g., *Anderson* v. *Commissioner of Correction*, 204 Conn. App. 712, 716–17, 254 A.3d 1011, cert. denied, 338 Conn. 914, 259 A.3d 1179 (2021).

"It is axiomatic that the [sixth amendment] right to counsel is the right to the effective assistance of counsel. . . . As an adjunct to this right, a criminal defendant is entitled to be represented by an attorney free from conflicts of interest.'' (Citations omitted; internal quotation marks omitted.) *Phillips* v. *Warden*, 220 Conn. 112, 132, 595 A.2d 1356 (1991). "We have described an attorney's conflict of interest as that which impedes his paramount duty of loyalty to his client.'' *State* v. *Crespo*, 246 Conn. 665, 689, 718 A.2d 925 (1998), cert. denied, 525 U.S. 1125, 119 S. Ct. 911, 142 L. Ed. 2d 909 (1999).

"[Although] the right to [conflict free] representation typically is implicated in cases involving representation of criminal codefendants by a single attorney . . . it is equally applicable in other cases [in which] a conflict of interest may impair an attorney's ability to represent his [or her] client effectively.'' (Citations omitted; internal quotation marks omitted.) *Phillips* v. *Warden*, supra, 220 Conn. 134–35. An attorney may confront a potential ethical conflict, for example, when representation of a client "somehow implicates counsel's personal or financial interests . . . .'' (Citations omitted.) *Mickens* v. *Taylor*, 535 U.S. 162, 174–75, 122 S. Ct. 1237, 152 L. Ed. 2d 291 (2002); see, e.g., *State* v. *Crespo*, supra, 246 Conn. 689–90 ("an attorney [also] may be considered

Diaz *v.* Commissioner of Correction

to be laboring under an impaired duty of loyalty, and thereby be subject to conflicting interests, because of interests or factors personal to him that are inconsistent, diverse or otherwise discordant with [the interests] of his client'' (internal quotation marks omitted)).

Under the sixth amendment to the United States constitution, as construed by the federal courts, whether a criminal conviction may be reversed on the basis of an attorney's conflicted loyalties depends on both the nature of the conflict alleged and whether that conflict was brought to the timely attention of the trial court. Courts apply three different standards to such claims, each of which arguably applies to the petitioner's claims in the present case.

First, under extremely limited circumstances, a conflict of interest can, in essence, be a form of structural error; see, e.g., *Weaver* v. *Massachusetts*, U.S. , 137 S. Ct. 1899, 1907–1908, 198 L. Ed. 2d 420 (2017) (discussing structural error doctrine); for which automatic reversal of a conviction is warranted, without regard to prejudice. To date, the United States Supreme Court has identified only one such scenario: automatic reversal is required when an attorney simultaneously represents multiple criminal codefendants, whose interests may be expected to be mutually adverse, and defense counsel timely represents to the trial court that joint, concurrent representation will create a potential conflict of interest, but the court neither releases counsel from the obligation nor determines that there is no conflict. In that circumstance, an attorney's divided loyalties may be presumed, and there is a per se violation of the sixth amendment right to counsel. See, e.g., *Mickens* v. *Taylor*, supra, 535 U.S. 168, citing *Holloway* v. *Arkansas*, 435 U.S. 475, 488, 98 S. Ct. 1173, 55 L. Ed. 2d 426 (1978).

The United States Supreme Court has not identified any conflicts, other than multiple representation sce-

Diaz *v.* Commissioner of Correction

narios in which a trial court knowingly and improperly permits joint representation, that would amount to per se violations of the sixth amendment and thus require automatic reversal of a conviction. Although the Supreme Court has not extended *Holloway* v. *Arkansas*, supra, 435 U.S. 488, to other types of conflicts of interest, the lower federal courts have recognized certain other situations in which automatic reversal is warranted. For example, the United States Court of Appeals for the Second Circuit has deemed it to be a per se violation of the sixth amendment when defense counsel is not authorized to practice law or when defense counsel is implicated in the very crime for which his or her client is on trial. See, e.g., *United States* v. *Kaid*, 502 F.3d 43, 46 (2d Cir. 2007) (citing cases). Although, in the present case, the petitioner's position is not entirely clear, we understand one of his arguments to be that we should further extend the reasoning of *Holloway*—and find a per se violation of the sixth amendment—to situations in which an attorney is employed as a Connecticut police officer while representing a criminal defendant. He argues that counsel in such cases is inherently conflicted by virtue of a Connecticut police officer's mandatory obligation to arrest suspected felons pursuant to § 54-1f (b). He contends that this statutory obligation creates an actual conflict, tantamount to structural error, for which automatic reversal is required. We address this claim in part II B 1 of this opinion.

Second, for certain alleged conflicts of interest, the federal courts apply the standard that the United States Supreme Court articulated in *Cuyler* v. *Sullivan*, 446 U.S. 335, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980).[3] The *Sullivan* standard is often framed as a two part test:

_____

[3] The paradigmatic *Sullivan* case is a multiple representation case in which the alleged conflict was not disclosed to the trial court, such that the court neither knew nor reasonably should have known that a conflict of interest existed. See *Cuyler* v. *Sullivan*, supra, 446 U.S. 343, 345.

Diaz *v.* Commissioner of Correction

"[I]n order to establish a violation of the sixth amendment" right to counsel based on defense counsel's actual, undisclosed conflict of interest, a petitioner "must establish (1) that counsel actively represented conflicting interests and (2) that [the] actual conflict of interest adversely affected his [counsel's] performance." (Internal quotation marks omitted.) *Phillips* v. *Warden*, supra, 220 Conn. 133; see also *Cuyler* v. *Sullivan*, supra, 348, 350. Although framed as a two part test, however, in practice, "[t]hese components are considered in a single, integrated inquiry." *Eisemann* v. *Herbert*, 401 F.3d 102, 107 (2d Cir. 2005). That is to say, "the *Sullivan* standard is not properly read as requiring inquiry into actual conflict as something separate and apart from adverse effect. An actual conflict, for [s]ixth [a]mendment purposes, is a conflict of interest that adversely affects counsel's performance." (Internal quotation marks omitted.) *Mickens* v. *Taylor*, supra, 535 U.S. 172 n.5; see also, e.g., *Russell* v. *Armstrong*, Docket No. Civ. A. 300CV1116SRU, 2006 WL 287203, *4 (D. Conn. February 2, 2006) ("[t]he actual conflict and adverse effect analyses are not distinct" (internal quotation marks omitted)).

Third, any alleged attorney conflicts of interest that are not subject to automatic reversal and that are not governed by the *Sullivan* standard are, like most other ineffective assistance of counsel claims, presumptively governed by *Strickland* v. *Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). The primary difference between *Sullivan* and *Strickland* is the lower burden that the petitioner must shoulder to establish a violation under *Sullivan*. See, e.g., *Mickens* v. *Taylor*, supra, 535 U.S. 174, 176; see also, e.g., *Rodriguez* v. *Commissioner of Correction*, 312 Conn. 345, 352, 92 A.3d 944 (2014).

Under *Strickland*, a petitioner must demonstrate that there is a reasonable probability that, but for the attor-

Diaz *v.* Commissioner of Correction

ney's deficient performance, the result of the proceeding would have been different. *Strickland* v. *Washington*, supra, 466 U.S. 694. By contrast, to demonstrate the adverse effect of a conflicted representation under *Sullivan*, the petitioner need only establish that "a conflict of interest actually affected the adequacy of [the] representation . . . ." *Cuyler* v. *Sullivan*, supra, 446 U.S. 349–50. This court has said that, "[t]o prove a lapse of representation [under *Sullivan*], a [petitioner] must demonstrate that some plausible alternative defense strategy or tactic might have been pursued but was not and that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests." (Internal quotation marks omitted.) *State* v. *Davis*, 338 Conn. 458, 478 n.13, 258 A.3d 633 (2021). In such cases, prejudice is presumed.[4]

[4] As we discussed, to prevail under *Sullivan*, a petitioner must establish that an *actual* conflict of interest adversely affected counsel's performance. See *Cuyler* v. *Sullivan*, supra, 446 U.S. 348, 350. We note that there is some confusion among the cases as to whether a merely *potential* or theoretical conflict of interest—one in which the interests of the defendant could place the attorney under inconsistent duties at some time in the future—is subject to review under *Strickland* or, rather, whether potential conflicts are not a cognizable basis for an ineffective assistance of counsel claim. The Appellate Court, following the lead of the United States Court of Appeals for the Second Circuit, has followed the former approach. See, e.g., *Santiago* v. *Commissioner of Correction*, 87 Conn. App. 568, 583–84 n.14, 867 A.2d 70 (citing *United States* v. *Williams*, 372 F.3d 96, 102–103 (2d Cir. 2004), for proposition that, to violate sixth amendment, merely potential conflicts of interest must result in *Strickland* prejudice), cert. denied, 273 Conn. 930, 873 A.2d 997 (2005); see also, e.g., *Lopez* v. *United States*, 792 Fed. Appx. 32, 36 (2d Cir. 2019) ("If a defendant can show only a potential conflict, he must show both that it had an adverse effect [on] his attorney's representation and that the conflict resulted in prejudice. . . . This amounts to the showing required by the ordinary ineffective assistance of counsel test from *Strickland*." (Citation omitted.)). Although we question the viability of this approach, in light of the facts that (1) the United States Supreme Court stated in *Cuyler* v. *Sullivan*, supra, 350, that "the possibility of conflict is insufficient to impugn a criminal conviction," (2) the other federal courts of appeals generally have not followed the Second Circuit in treating merely potential conflicts of interest as cognizable claims under *Strickland*, and we are not aware of any court that has reversed a conviction on the basis of a purely potential conflict of interest, and (3) it is difficult to envision

344 Conn. 365        AUGUST, 2022              379

Diaz *v.* Commissioner of Correction

See, e.g., *Rodriguez* v. *Commissioner of Correction*, supra, 312 Conn. 352–53.

The first question we must resolve is whether *Sullivan* or *Strickland* governs the petitioner's claim that Canace was encumbered by an actual conflict of interest that rendered his representation of the petitioner ineffective by, among other things, causing him to hold back when cross-examining police witnesses. See part II B 2 of this opinion. The respondent notes that there is a division among the lower federal courts as to how to apply the United States Supreme Court's conflict of interest cases with regard to personal conflicts of the type at issue in the present case. Prior to *Mickens*, many, if not most, federal courts that addressed the issue had assumed that such conflicts are governed by *Sullivan*. See, e.g., *Mickens* v. *Taylor*, supra, 535 U.S. 174–75 (citing cases). Consistent with that approach, in *Phillips*, this court applied the *Sullivan* standard to an attorney's personal conflicts of interest vis-à-vis a single client. See *Phillips* v. *Warden*, supra, 220 Conn. 133, 136, 144. In *Mickens*, however, the United States Supreme Court questioned the propriety of the lower courts' "expansive application" of *Sullivan* to cases of attorney ethical conflicts, noting that the rationales for departing from the *Strickland* standard do not necessarily apply outside of the multiple concurrent representation context, such as when an attorney's personal interests are at issue. *Mickens* v. *Taylor*, supra, 174–75. The court left open the question of whether *Sullivan* should be extended to personal conflict of interest cases. See id., 176.

Following *Mickens*, the majority of federal courts of appeals have taken the position that, in order to prevail

how a merely potential conflict of interest could ever result in *Strickland* prejudice (likely altering the result of the proceeding) without first having become an actual conflict, we need not resolve the issue in the present appeal because the petitioner has not alleged that he suffered *Strickland* prejudice as the result of a potential conflict of interest.

on a claim of ineffective assistance of counsel that is based on an alleged personal conflict of interest, the petitioner or defendant must establish *Strickland* prejudice. See, e.g., *McRae* v. *United States*, 734 Fed. Appx. 978, 983 (6th Cir. 2018) (purporting to join United States Courts of Appeals for First, Second, Fifth, Sixth, Eighth, Tenth and Eleventh Circuits in requiring showing of *Strickland* prejudice), cert. denied, U.S. , 139 S. Ct. 1599, 203 L. Ed. 2d 757 (2019). Those courts reasoned that the United States Supreme Court has cautioned against overbroad application of *Sullivan* and that it is often possible to identify specific harms arising from the conflicted representation in such cases. See, e.g., id., 984; see also, e.g., id., 983 (citing cases). Other federal courts of appeals have continued to apply the *Sullivan* presumed prejudice standard in personal conflict of interest cases, reasoning that, just as in cases of multiple representation, "it is difficult to measure the precise effect on the defense when representation is corrupted by conflicting interests." (Internal quotation marks omitted.) *Rubin* v. *Gee*, 292 F.3d 396, 402 (4th Cir.), cert. denied, 537 U.S. 1048, 123 S. Ct. 637, 154 L. Ed. 2d 523 (2002); see, e.g., *Reynolds* v. *Hepp*, 902 F.3d 699, 708 (7th Cir. 2018) ("[s]ince before *Mickens*, we have at least assumed that *Sullivan* extends to financial conflicts of interests"), cert. denied, U.S. , 140 S. Ct. 160, 205 L. Ed. 2d 51 (2019); *United States* v. *Walter-Eze*, 869 F.3d 891, 900 (9th Cir. 2017) (assuming, without deciding, that *Sullivan* applies to cases of pecuniary conflict), cert. denied, U.S. , 139 S. Ct. 1196, 203 L. Ed. 2d 226 (2019); *Rubin* v. *Gee*, supra, 401–402 (applying *Sullivan*).

This court has followed the latter approach, continuing to broadly apply *Sullivan*, even in the wake of *Mickens*. See, e.g., *State* v. *Davis*, supra, 338 Conn. 477–78. The respondent invites us to revisit the question in the present case, emphasizing the need for some reliable

344 Conn. 365 AUGUST, 2022 381

Diaz *v.* Commissioner of Correction

benchmark by which to assess the impacts of an alleged conflict of interest. Because the petitioner cannot prevail even under the more petitioner-friendly *Sullivan* standard; see part II B 2 of this opinion; however, we decline to revisit at this time the question of whether *Strickland* prejudice must be demonstrated in habeas cases involving purely personal conflicts of interest.

B

With these principles in mind, we now consider the merits of the petitioner's habeas petition to determine whether the test we adopted in *Simms* v. *Warden*, supra, 230 Conn. 612, 615–16, is satisfied. We understand the petitioner to be making two claims with respect to Canace's alleged conflict of interest. First, the petitioner contends that, as a matter of law, a Connecticut police officer cannot serve as defense counsel—at least, not without an adequate waiver—because the duties entailed by those two roles are necessarily in conflict. For this claim, the petitioner seeks to have us extend *Holloway*, on the rationale that his claim involves an inherent conflict and, thus, structural error. Second, the petitioner contends that, in this particular case, Canace's obligations as a police officer undermined his ability to effectively represent the petitioner, giving rise to an actual conflict of interest under *Sullivan*.[5] We consider each claim in turn.

1

The petitioner first argues that for an individual to simultaneously serve as a Connecticut police officer and to represent a criminal defendant creates a per se conflict of interest, even if the alleged crimes were committed, investigated, and prosecuted outside of the

_____

[5] It was not entirely clear from the petitioner's briefing and his arguments before this court whether these are distinct theories of conflict of interest or, rather, whether the former represents the alleged conflict and the latter the adverse effect. In either event, we find his claims unpersuasive.

Diaz *v.* Commissioner of Correction

city or town in which the officer serves. Although we have not previously had cause to consider the issue, we agree with those courts that have concluded that for a police officer to serve as defense counsel in a different jurisdiction does not create a categorical conflict of interest. See, e.g., *Paradis* v. *Arave*, 130 F.3d 385, 391 (9th Cir. 1997); *State* v. *Gonzales*, 483 So. 2d 1236, 1236–37 (La. App. 1986). But see, e.g., *People* v. *Gelbman*, 150 Misc. 2d 466, 468, 568 N.Y.S.2d 867 (Justice Ct. 1991) (rule of professional conduct barred representation). This case law is consistent with the guidance that Canace received from the Statewide Grievance Committee and New Haven corporation counsel, namely, that his representation of criminal defendants was permissible, provided it occurred outside of the judicial district of New Haven and was properly disclosed. Indeed, a properly notified criminal defendant may well benefit from a police officer's experience and insider knowledge of police work. See, e.g., *State* v. *Gonzales*, supra, 1237 (arguable that "the complained of conflict of interest worked to the appellant's benefit [because] counsel's knowledge of police procedures was an asset in developing the defense strategy").

Although the petitioner does not necessarily disagree that a police officer might provide conflict free representation in some other state, he contends that for an individual to simultaneously serve as a *Connecticut* police officer and to represent a criminal defendant creates an inherent conflict of interest because all of this state's police officers are bound by § 54-1f (b). That provision provides that "[m]embers of the Division of State Police within the Department of Emergency Services and Public Protection or of any local police department or any chief inspector or inspector in the Division of Criminal Justice shall arrest, without previous complaint and warrant, any person who the officer has reasonable grounds to believe has committed or is committing

344 Conn. 365 AUGUST, 2022 383

Diaz *v.* Commissioner of Correction

a felony.'''[6] General Statutes § 54-1f (b). The petitioner asserts that § 54-1f (b) obligated Canace to arrest him if Canace had reasonable grounds to suspect that he had committed or was attempting to commit a crime.[7] The petitioner further asserts that this obligation directly conflicted with Canace's duty of loyalty to his client, the petitioner, and aligned Canace's interests with those of the New Britain police officers who testified for the state at the petitioner's second criminal trial.

We acknowledge that the petitioner's argument, although perhaps counterintuitive, finds support in the plain language of the statute. The use of the phrase "shall arrest" might suggest that police officers have a mandatory, nondiscretionary duty to arrest suspected felons. Furthermore, that broadly worded mandate could be read to imply that officers must arrest all suspected felons under all circumstances, regardless of when or where the suspected crime was committed. We conclude, however, that the petitioner's interpretation is not the only plausible reading of the statutory language and that adopting his interpretation would "yield absurd or unworkable results . . . ." General Statutes § 1-2z.

---

[6] For purposes of brevity, we refer to such individuals as "suspected felons" in this opinion.

[7] Although the petitioner's brief suggests that Canace might have been obligated to arrest the petitioner for the crimes with which he already had been charged, during oral argument before this court, counsel for the petitioner conceded that Canace would have been under no obligation to rearrest the petitioner for those crimes. He contended, however, that there is nevertheless an inherent conflict of interest because, in the course of representation, Canace might have come to suspect that the petitioner had committed other crimes, or that the petitioner intended to offer perjured testimony. He posits that, under § 54-1f (b), Canace would be required to immediately arrest his client if he had any reasonable grounds for such suspicions. Because this presents an inherent conflict, he contends, the representation was a form of structural error for which *Holloway* should be extended to mandate reversal. Given that we conclude that there was no inherent conflict in Canace's duties under Connecticut law, we need not decide whether *Holloway* should be extended to this situation.

Diaz *v.* Commissioner of Correction

It is well established "that the use of the word shall, though significant, does not invariably create a mandatory duty." (Internal quotation marks omitted.) *Electrical Contractors, Inc.* v. *Ins. Co. of the State of Pennsylvania*, 314 Conn. 749, 757, 104 A.3d 713 (2014). "The mere fact that a statute uses the word shall in prescribing the function of a government entity or officer should not be assumed to render the function necessarily obligatory in the sense of removing the discretionary nature of the function . . . ." (Internal quotation marks omitted.) *Mills* v. *Solution, LLC*, 138 Conn. App. 40, 51, 50 A.3d 381, cert. denied, 307 Conn. 928, 55 A.3d 570 (2012). We thus conclude that the statutory language is ambiguous, and, therefore, we "look to other relevant considerations, beyond the legislature's use of the term 'shall,' to ascertain the meaning of the statute." *Electrical Contractors, Inc.* v. *Ins. Co. of the State of Pennsylvania*, supra, 758.

"It is axiomatic that [w]e must interpret the statute so that it does not lead to absurd or unworkable results." (Internal quotation marks omitted.) *Wilkins* v. *Connecticut Childbirth & Women's Center*, 314 Conn. 709, 723, 104 A.3d 671 (2014). In the present case, the petitioner's reading of § 54-1f is unworkable on many levels and would lead to absurd results.

To start, treating the statute as mandatory would deprive police officers of the necessary discretion as to whether and when to arrest a suspected felon. See, e.g., *Castle Rock* v. *Gonzales*, 545 U.S. 748, 761, 125 S. Ct. 2796, 162 L. Ed. 2d 658 (2005) (recognizing "[t]he deep-rooted nature of [law enforcement] discretion, even in the presence of seemingly mandatory legislative commands"); *Smart* v. *Corbitt*, 126 Conn. App. 788, 800, 14 A.3d 368 (discussing importance of police discretion in carrying out routine duties), cert. denied, 301 Conn. 907, 19 A.3d 177 (2011). Undercover work, for example, would become impossible, as an officer would be required

Diaz *v.* Commissioner of Correction

to shed his or her cover upon encountering the first suspected felon. Additionally, the petitioner's reading of § 54-1f (b) would require police officers to make arrests even when the suspected crime was committed long ago, outside the statute of limitations, or outside of the officer's jurisdiction. Thus, although the petitioner's reading of the statute has surface appeal, it ultimately leads to absurd results and is unworkable.[8]

[8] Because the use of the word "shall" in the statutory language is ambiguous; see, e.g., *Electrical Contractors, Inc.* v. *Ins. Co. of the State of Pennsylvania*, supra, 314 Conn. 757; and also because a strict facial reading leads to absurd, unworkable results, we may consider the legislative history of the statute. See General Statutes § 1-2z. The legislative history of § 54-1f (b) supports our conclusion that the word "shall" is used in its discretionary, rather than mandatory, sense. The original version of the statute, which gave constables the power to make warrantless arrests, was clearly discretionary rather than mandatory. See Code of Laws, Constables (1650), reprinted in 1 Col. Rec. 509, 522 (J. Trumbull ed., 1850).

In *State* v. *Carroll*, 131 Conn. 224, 38 A.2d 798 (1944), this court interpreted a predecessor to the current version of the statute, which provided in relevant part that "police officers . . . *shall* arrest, without previous complaint and warrant, any person for any offense in their jurisdiction, when the offender shall be taken or apprehended in the act or on the speedy information of others . . . ." (Emphasis added; internal quotation marks omitted.) Id., 227, quoting General Statutes (1930 Rev.) § 239. Despite the statute's use of the word "shall," this court, in discussing the law, repeatedly characterized it in discretionary terms. See, e.g., *State* v. *Carroll*, supra, 228 ("at common law a peace officer *could* arrest without a warrant" (emphasis added; internal quotation marks omitted)); id. (legislature intended to limit common-law *right* of arrest); id., 230 (statute means that peace officer "*may* make such an arrest" (emphasis added)); id., 231 (police officer "may act" on information he has reasonable grounds to accept as accurate); id. (statute "restricts the *right* of a police officer to arrest" (emphasis added)).

In 1945, when the legislature amended the statute and adopted language substantially similar to that of the current version, the legislators who sponsored the amendment, as well as the representatives of the law enforcement community who championed it, almost universally described the amended statute as providing police officers with the right or authority to make warrantless arrests, rather than the duty or obligation to arrest any suspected felon. See, e.g., 1 S. Proc., 1945 Sess., p. 243, remarks of Senator Albert L. Coles ("Here a police officer would be *permitted* to arrest a known criminal when he sees him on the street. He *could* apprehend him . . . . [N]ow . . . you give him no *authority*." (Emphasis added.)); id., remarks of Senator Leon RisCassi ("The law today and . . . for decades has been that in [b]reach of [p]eace cases you *can arrest* if you see the crime committed or if someone tells you that it has been committed. Of course you *can* always arrest on

Diaz *v.* Commissioner of Correction

Our conclusion is consistent with *Castle Rock* v. *Gonzales*, supra, 545 U.S. 748, in which the United States Supreme Court indicated, in dictum, that a Colorado statute using language similar to that of § 54-1f (b) would not deprive a peace officer of discretion, despite the use of the phrase "shall apprehend" in the Colorado statute. (Internal quotation marks omitted.) Id., 761. The court explained that "[a] well established tradition of police discretion has long coexisted with apparently mandatory arrest statutes." Id., 760. "In each and every state there are long-standing statutes that, by their terms, seem to preclude nonenforcement by the police. . . . However, for a number of reasons, including their legislative history, insufficient resources, and sheer physical impossibility, it has been recognized that such statutes cannot be interpreted literally. . . . [T]hey clearly do not mean that a police officer may not lawfully decline to . . . make an arrest." (Internal quotation marks omitted.) Id.

For these reasons, we are not persuaded by the petitioner's theory that § 54-1f (b), which gives patrolling officers the authority to arrest suspected felons whom they happen across, *requires* off duty officers, such as Canace, to arrest their clients whenever they suspect that those clients may have committed other crimes, even outside of their jurisdictions.[9] Accordingly, and

evidence. This gives you the *right* to arrest on a crime committed or to be committed." (Emphasis added.)); 1 H.R. Proc., Pt. 3, 1945 Sess., p. 860, remarks of Representative Luke H. Stapleton ("[t]his bill would include . . . members of some other organized police force . . . to *permit* them to make arrests without warrants" (emphasis added)); Conn. Joint Standing Committee Hearings, Judiciary, Pt. 2, 1945 Sess., p. 402, remarks of Police Chief Donnelly, Bridgeport Police Department (arguing that, under proposed bill, police officer "would have something definite or tangible to go by when he is out there in the street and to make that *decision*" (emphasis added)); id., p. 480, remarks of John Gleason, chief of police of the Greenwich Police Department ("a policeman has to make [speedy decisions] . . . so I think he should lay within his rights in making an arrest withou[t] [a] warrant").

[9] We recognize that even the fact that the statute seemingly affords a police officer acting as a defense counsel the *discretion* to arrest a suspected felon outside of the officer's jurisdiction could create ethical problems in

344 Conn. 365 AUGUST, 2022 387

Diaz *v.* Commissioner of Correction

particularly in light of the United States Supreme Court's hesitance to recognize new categories of per se conflicts of interest beyond the one recognized in *Holloway*, we find that there is no inherent conflict of interest when a police officer who is also a licensed attorney represents a criminal defendant in a different Connecticut jurisdiction. Nevertheless, because the petitioner raised a colorable question of statutory interpretation that had not previously been directly addressed by this state's appellate courts, we conclude that the habeas court abused its discretion in denying certification to appeal.

2

We now turn our attention to the petitioner's alternative argument that Canace's undisclosed status as a law enforcement officer became an actual conflict of interest during the petitioner's second criminal trial insofar as it led Canace to decline to pursue plausible alternative defense strategies or tactics. Before the habeas court, the petitioner pointed to various ways in which Canace's dual role allegedly manifested an actual conflict of interest and compromised the effectiveness of his representation of the petitioner. Before this court, however, the petitioner limits his argument to several ways in which the purported conflict of interest allegedly led Canace to hold back when cross-examining other police officers, most notably Jerry Chrostowski of the New Britain Police Department.[10] The petitioner

the representation of a criminal defendant. See *State* v. *Kuskowski*, 200 Conn. 82, 85–86, 510 A.2d 172 (1986) (§ 54-1f (b) permits extrajurisdictional arrest by officer who witnesses and has probable cause to believe that crime is being committed). We decline to address this issue, however, because the petitioner has not raised the issue, let alone demonstrated how the mere authority to arrest affected Canace's representation, as would be necessary to establish an actual conflict of interest.

[10] The petitioner contends, for example, that Canace failed to adequately cross-examine Chrostowski as to inconsistencies in his and other witnesses' testimony regarding (1) the circumstances under which narcotics were found in the petitioner's apartment, (2) the police officers' prior familiarity with the petitioner, and (3) whether Lockery had purchased drugs from the petitioner.

Diaz *v.* Commissioner of Correction

contends that, because the state's case in the second criminal trial was built around the testimony of the New Britain police officers who arrested him and searched his apartment, the officers' credibility was paramount, and, therefore, Canace's hesitancy to question the officers was highly prejudicial.

The habeas court thoroughly analyzed the petitioner's claims of inadequate cross-examination and found them to be without merit for several reasons. First, the court credited Canace's testimony that he did not abandon any defense strategies for fear of challenging the credibility of fellow police officers. Second, the habeas court determined that Canace made reasonable strategic decisions as to which lines of inquiry to pursue, using his knowledge of police work to identify instances of poor police investigation. Third, the habeas court recounted all of the ways in which Canace attempted, with varying degrees of success, to challenge the credibility and undermine the testimony of the New Britain police officers. For example, the habeas court found that Canace "pursued a strategy [of attempting to demonstrate] that the police had set up the petitioner . . . ."

The Appellate Court reviewed, at some length, the petitioner's challenges to the findings and conclusions of the habeas court and found them to be meritless. See *Diaz* v. *Commissioner of Correction*, supra, 200 Conn. App. 551–53. Nothing in the petitioner's brief, his argument before this court, or our independent review of the record leads us to reject the conclusions of those courts that Canace's duties as a police officer did not materially impact his representation of the petitioner, and no useful purpose would be served by repeating their analyses here. In short, we see no reason to second-guess the determination of the habeas court that there was no constitutionally relevant actual conflict of interest because the petitioner was unable to establish *Sullivan* prejudice, namely, that Canace failed to pursue

Diaz *v.* Commissioner of Correction

some plausible, alternative defense strategy or tactic that was inherently in conflict with or not undertaken due to his other loyalties.

III

Finally, we emphasize that our conclusion that the petitioner has not demonstrated that Canace's performance suffered from an actual conflict of interest should not be taken to mean that we condone Canace's conduct in the present case. We do not.

Regardless of whether he violated rule 1.7 of the Rules of Professional Conduct,[11] which governs attorney conflicts of interest, it seems likely that Canace violated rule 1.4 of the Rules of Professional Conduct, which requires an attorney to "promptly inform the client of any decision or circumstance with respect to which the client's informed consent . . . is required . . . ."[12] Rules of Professional Conduct 1.4 (a) (1). Attor-

---

[11] Rule 1.7 of the Rules of Professional Conduct provides in relevant part: "(a) . . . a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:

"(1) the representation of one client will be directly adverse to another client; or

"(2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer. . . ."

As we discussed; see part II A of this opinion; the petitioner carries a higher burden in establishing a sixth amendment violation on the basis of an alleged conflict of interest than would be necessary to establish that an attorney ran afoul of the Rules of Professional Conduct. Specifically, in order to establish a violation of his constitutional right, the petitioner must establish that an actual conflict of interest adversely impacted the representation; see, e.g., *Cuyler* v. *Sullivan*, supra, 446 U.S. 348, 350; *Phillips* v. *Warden*, supra, 220 Conn. 133; and not merely that there was a significant risk of a material limitation. See Rules of Professional Conduct 1.7 (a) (2).

[12] The ethics opinion that Canace obtained prior to engaging as a defense counsel expressly required him to disclose his status as a police officer to potential clients because that information was material to the representation and because he might later be required to withdraw if it turned out that his own police department was involved in investigating or prosecuting the petitioner.

Diaz *v.* Commissioner of Correction

ney conduct may breach ethical standards, however, without violating the sixth amendment right to counsel. See, e.g., *Mickens* v. *Taylor*, supra, 535 U.S. 176; see also, e.g., *United States* v. *Walter-Eze*, supra, 869 F.3d 906 ("the presumed prejudice rule was not intended to enforce the Canons of Legal Ethics" (internal quotation marks omitted)). Indeed, although there undoubtedly is some overlap, the constitutional right to effective assistance of counsel and the rules that govern attorney ethical conduct serve fundamentally different purposes. See, e.g., *Beets* v. *Scott*, 65 F.3d 1258, 1272 (5th Cir. 1995) ("the purpose of the [s]ixth [a]mendment is not primarily to police attorneys' ethical standards and create a constitutional code of professional conduct . . . [but, rather] its purpose is to [ensure] a fair trial based on competent representation"), cert. denied sub nom. *Beets* v. *Johnson*, 517 U.S. 1157, 116 S. Ct. 1547, 134 L. Ed. 2d 650 (1996).

It is true that Canace had satisfied himself, and the New Haven corporation counsel, that his work as a criminal defense attorney outside of the judicial district of New Haven did not create a per se conflict of interest. But that in no way justified his decision either to mislead the Office of the Chief Public Defender regarding the nature of his work for the city of New Haven—by listing his employment with the city as a "municipal employee," which covers any occupation with the city, rather than as a police officer—or to fail to disclose to his client, the petitioner, that he was simultaneously employed as a police officer. Although those actions may not have risen to the level of an actual conflict of interest for purposes of the sixth amendment, they certainly were unbecoming of an officer of the court.

The form of the judgment of the Appellate Court is improper, the judgment of the Appellate Court is reversed, and the case is remanded to that court with

344 Conn. 365 AUGUST, 2022 391

Diaz *v.* Commissioner of Correction

direction to affirm the judgment of the habeas court denying the petition for a writ of habeas corpus.

In this opinion the other justices concurred.

ROBINSON, C. J., with whom ECKER, J., joins, concurring in the judgment. I join the majority's opinion insofar as it upholds the trial court's denial of the habeas corpus petition brought by the petitioner, Daniel Diaz, but reverses and remands the case to the Appellate Court for a corrected judgment.[1] See *Diaz* v. *Commissioner of Correction*, 200 Conn. App. 524, 554, 240 A.3d 795 (2020). I ultimately agree with the majority's conclusion that the petitioner failed to prove a violation of his right to the effective assistance of counsel under the sixth and fourteenth amendments to the United States constitution at his second criminal trial for the sale of narcotics on the ground that his criminal defense attorney, Frank Canace, labored under an actual conflict of interest given his concurrent employment as a New Haven police officer.[2] I write separately to high-

---

[1] Specifically, I agree with the majority's determination that the form of the Appellate Court's judgment, which dismissed the appeal rather than affirmed the judgment of the habeas court, was improper, thus requiring reversal and a remand for a corrected judgment.

[2] I agree with the majority's statement of the law with respect to conflicts of interest, namely, that, under *Cuyler* v. *Sullivan*, 446 U.S. 335, 348, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980), a defendant is required to prove "(1) that [defense] counsel actively represented conflicting interests and (2) that an actual conflict of interest adversely affected his [counsel's] performance. . . . As we previously have explained, an attorney may be subject to conflicting interests when interests or factors personal to him [or her] . . . are inconsistent, diverse or otherwise discordant with [the interests] of his [or her] client . . . . To prove adverse effect, a defendant must demonstrate that some plausible alternative defense strategy or tactic might have been pursued but was not and that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests." (Citations omitted; footnotes omitted; internal quotation marks omitted.) *State* v. *Davis*, 338 Conn. 458, 477–78, 258 A.3d 633 (2021); see id., 477–78 n.13 ("Prejudice may be presumed in some sixth amendment contexts, such as the actual or constructive denial of assistance of counsel altogether or various forms of state interference with counsel's assistance. . . . In the context . . . of counsel allegedly burdened by a conflict of interest . . . there is no presumption of prejudice per se. Prejudice is pre-

Diaz *v.* Commissioner of Correction

light my concerns about the propriety of an active duty
municipal police officer moonlighting as a criminal
defense attorney, even in judicial districts located out-
side the municipality that officer serves. In my view,
case law and ethics opinions endorsing this practice—
including the one on which Canace relied in this case—
are inconsistent with contemporary understandings of
policing culture insofar as the attorney is left standing

sumed only if the defendant demonstrates that counsel actively represented
conflicting interests and that . . . conflict of interest adversely affected
[counsel's] performance." (Internal quotation marks omitted.)); see also part
II A of the majority opinion.

As we stated more than thirty years ago in a seminal conflicts decision
by this court, "[a]t the core of the sixth amendment guarantee of effective
assistance of counsel is loyalty, perhaps the most basic of counsel's duties.
. . . Loyalty of a lawyer to his client's cause is the sine qua non of the
[s]ixth [a]mendment's guarantee that an accused is entitled to effective
assistance of counsel. . . . That guarantee affords a defendant the right to
counsel's undivided loyalty." (Citations omitted; internal quotation marks
omitted.) *Phillips* v. *Warden*, 220 Conn. 112, 136–37, 595 A.2d 1356 (1991),
citing *Strickland* v. *Washington*, 466 U.S. 668, 692, 104 S. Ct. 2052, 80 L.
Ed. 2d 674 (1984), and *Cuyler* v. *Sullivan*, supra, 446 U.S. 356 (Marshall,
J., concurring in part and dissenting in part). "This requirement of loyalty
carries with it the correlative duty of exercising independent professional
judgment on the client's behalf, and both those duties are also reflected in
the relevant disciplinary guidelines." *Phillips* v. *Warden*, supra, 137. "[A]
lawyer shall not represent a client if . . . there is a significant risk that the
representation of one or more clients will be materially limited . . . by a
personal interest of the lawyer." Rules of Professional Conduct 1.7 (a) (2).
The commentary to rule 1.7 reinforces these ethical precepts. The commen-
tary provides in relevant part that "[l]oyalty and independent judgment are
essential elements in the lawyer's relationship to a client," that such loyalty
is impaired "if there is a significant risk that a lawyer's ability to consider,
recommend or carry out an appropriate course of action for the client will
be materially limited as a result of the lawyer's other responsibilities or
interests," and that "[t]he lawyer's own interests must not be permitted to
have an adverse effect on representation of a client." Rules of Professional
Conduct 1.7, commentary; see *Phillips* v. *Warden*, supra, 138 (quoting pre-
2007 revision of rule 1.7 and commentary thereto).

I similarly agree with the majority's conclusion that General Statutes § 54-
1f (b)—which empowers a police officer to make warrantless arrests of
persons whom "the officer has reasonable grounds to believe has committed
or is committing a felony"—is discretionary rather than mandatory in nature
and, therefore, did not create an inherent conflict of interest that is structural
in nature, thus requiring per se invalidation of the petitioner's conviction
as a result of his representation by Canace. See part II B 1 of the major-
ity opinion.

Diaz *v.* Commissioner of Correction

with one foot on either side of the "thin blue line" that is perceived to prevail between their loyalties to both their criminal defense client and their brother and sister officers. Nevertheless, I concur in the judgment of the majority because there is nothing in the record to indicate that the cultural nature of this conflict was raised or that it affected Canace's representation of the petitioner.

In my view, much of the fairly limited case law and ethics opinions that consider the potential conflicts arising from an active duty police officer concurrently serving as a criminal defense attorney unduly focus on jurisdictional, rather than cultural and psychological, boundaries in considering whether a conflict exists. One notable federal case, cited by both the majority and the Appellate Court, is *Paradis* v. *Arave*, 130 F.3d 385 (9th Cir. 1997), in which the habeas petitioner, Donald M. Paradis, challenged his state murder conviction on several grounds, including that "his trial counsel . . . suffered from a conflict of interest while acting as his appointed defense counsel during the criminal trial," insofar as the attorney was employed as a Coeur d'Alene city park police officer at the time of trial. Id., 391; see part II B 1 of the majority opinion; *Diaz* v. *Commissioner of Correction*, supra, 200 Conn. App. 550. Applying *Cuyler* v. *Sullivan*, 446 U.S. 335, 348, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980); see footnote 2 of this opinion; the United States Court of Appeals for the Ninth Circuit rejected Paradis' argument that the attorney's employment as a city park police officer created a conflict of interest that rose to the level of a sixth amendment violation, emphasizing that there was "no showing that [the attorney] *actively represented* conflicting interests. Because the city police of Coeur d'Alene, let alone its park police, were not involved in the investigation of [the] murder, no conflict of interest flow[ed] eo ipso from [the attorney's] additional employ-

Diaz *v.* Commissioner of Correction

ment. Potentially divided allegiances do not constitute active representation of conflicting interests.''[3] (Empha-

---

[3] I note that one case from the United States Court of Appeals for the Second Circuit, *United States* v. *Rogers*, 209 F.3d 139 (2d Cir. 2000), considered the extent to which a criminal defense attorney's service as a city police commissioner created a conflict of interest for sixth amendment purposes. In *Rogers*, the defendant's trial attorney "was simultaneously serving as one of six New Haven police commissioners whose role it [was] (i) to approve the police budget, (ii) to consult with the police chief about the department, (iii) to work with the police chief to make departmental rules and regulations, and to make and evaluate departmental policy, and (iv) to appoint, promote and remove police officers.'' Id., 141. After he was convicted but before he was sentenced, the defendant himself alerted the District Court to his attorney's status as a police commissioner after learning about it through a newspaper article. He argued that, under *Cuyler* v. *Sullivan*, supra, 446 U.S. 335, his attorney's "position on the board of police commissioners was an actual conflict of interest that had an adverse effect on the lawyer's performance'' because it led him to be hesitant to file a suppression motion or to call police witnesses, and further resulted in [his] making an "inadequate summation . . . and repeatedly advis[ing] [him] to plea[d] guilty and cooperate with the government. [The defendant] also argued that [counsel] violated his ethical obligation to advise him, and the court, of any possible conflict.'' *United States* v. *Rogers*, supra, 142. The District Court found that there ultimately was no adverse effect on the attorney's performance, even if his position as a police commissioner was indeed an actual conflict, and reiterated that conclusion at sentencing, stating that the court had been aware of the attorney's police commissioner role for several years and that the attorney had provided professionally competent representation at trial, and crediting the attorney's statement that, as a commissioner, his responsibilities were "administrative and oversight,'' with no law enforcement responsibilities or participation. Id., 143. The Second Circuit, however, reversed the defendant's conviction under the automatic reversal rule of its decision in *United States* v. *Levy*, 25 F.3d 146, 153 (2d Cir. 1994), concluding that the District Court had failed to conduct the inquiry required by its awareness *before* trial of the possibility of a conflict created by the attorney's role as a police commissioner. See *United States* v. *Rogers*, supra, 143–44. Although the Second Circuit determined that the District Court's failure to inquire relieved it from having to decide whether the attorney's role as a police commissioner amounted to an actual conflict, the Second Circuit observed that, "[i]n light of the apparent issues and anticipated witnesses, the [District] [C]ourt's awareness that [the attorney] was a police commissioner presented a [nonfrivolous] conflict issue of a kind that created a duty of inquiry on the part of the [D]istrict [C]ourt.'' Id., 144. The court also observed that the attorney's posttrial explanations about the purely administrative role of the police commissioners "fail[ed] to dispel the possibility of conflict'' because, as a police commissioner, the attorney "had responsibility for police policy, police personnel, the police budget and [nonspecific] oversight. It is certainly possible that such responsibilities [could] produce an institutional loyalty. That effect [was] not necessarily

Diaz *v.* Commissioner of Correction

sis in original.) *Paradis* v. *Arave*, supra, 391; see *State*
v. *Gonzales*, 483 So. 2d 1236, 1236–37 (La. App. 1986)
(The court rejected the defendant's claim "that [his]
court-appointed defense attorney was also a reserve
police officer'' whose "divided loyalties'' created an
actual conflict that adversely affected his performance
under *Sullivan* because the "record . . . show[ed] a
vigorous and competent representation by the defense
counsel. Indeed it is [arguable] that the complained of
conflict of interest worked to the [defendant's] benefit
[because] counsel's knowledge of police procedures
was an asset in developing the defense strategy.''); cf.
*Herring* v. *Secretary, Dept. of Corrections*, 397 F.3d
1338, 1355–58 (11th Cir.) (defense counsel's status as
"special deputy sheriff'' did not create impermissible
conflict of interest because that status was granted as
common professional courtesy to allow counsel to carry
concealed firearm and counsel had no law enforcement
certification, responsibilities or experience, rendering
status "honorary'' in nature, which counsel resigned
when law changed to permit issuance of concealed
carry permits), cert. denied sub nom. *Herring* v. *Crosby*,
546 U.S. 928, 126 S. Ct. 171, 163 L. Ed. 2d 277 (2005).

In *People* v. *Gelbman*, 150 Misc. 2d 466, 568 N.Y.S.2d
867 (Justice Ct. 1991), a municipal trial court granted
a motion to disqualify a criminal defense attorney who
was also a town police officer from representing a

detrimental to criminal defense. Institutional loyalty could [compel] a com-
missioner (variously) to root out abuses, or to avoid unfair attacks on the
police, or to dampen suspicions that would be stirred in a lawyer who has
no relationship with the police. If [the attorney] had a divided loyalty, it is
hard to say which way it cut, but it [was] enough to observe . . . that
divided loyalties are rarely divided down the middle.'' Id., 145–46. Thus, the
court held that "a possible conflict existed, prompting a duty of inquiry,''
and automatic reversal was required because "the [D]istrict [C]ourt failed
to perform this duty . . . .'' Id., 146; see id. ("[the court] therefore adopts
and applies a firm preference for prophylactic inquiry, in which any conflict
is identified and either eliminated or knowingly and voluntarily waived
[pretrial], over an avoidably delayed and less certain inquiry after the fact'').

defendant in a criminal proceeding in that municipality's court. See id., 467, 469. The court relied on an ethics opinion stating that an attorney may not practice criminal law in the municipal courts "because it would be inappropriate for the [p]olice [o]fficer personally to represent criminal defendants" as, "no matter how earnest and complete a defense a lawyer provides, there is an obvious danger that a convicted defendant will believe that his defense was inadequate because of the lawyer's bias as a [p]olice [o]fficer. Conversely, the public might lose faith in the criminal justice system if it believes that the lawyer was employed in the hope that the lawyer's position as a [police officer] . . . might enable the lawyer to obtain a more lenient treatment for the defendant. A police officer is widely viewed as a representative of the [p]eople. [The court] believe[s] that the representation of a criminal defendant by a police officer could lessen public confidence in the integrity of the criminal justice system." (Internal quotation marks omitted.) Id., 467–68. In *State* v. *White*, 114 S.W.3d 469 (Tenn. 2003), the court upheld the disqualification of a criminal defense attorney, who had been sworn in as an assistant county district attorney and who also served as a part-time prosecutor in municipal court, because the attorney's "dual roles as assistant district attorney general and defense counsel in the same county were inherently antagonistic and thus, created an actual conflict of interest." Id., 478. The court relied on the fact that the attorney's relationships with fellow prosecutors and police officers could be jeopardized insofar as "[z]ealous representation of criminal defendants very often will require . . . vigorous cross-examination of the testimony of such law enforcement personnel, and in many instances will require challenging the very laws the prosecutor is charged to enforce. Even if cross-examination of such personnel would not involve the disclosure of confidences and secrets of the

Diaz *v.* Commissioner of Correction

state or municipality, the desire to maintain a harmonious working relationship with these law enforcement officers could adversely affect the inquiring attorney's zeal in conducting such cross-examination.'' (Internal quotation marks omitted.) Id. ''The [d]isciplinary [r]ules preventing conflicts of interests were specifically designed to free the lawyer's judgment from such compromising interests and loyalties.'' (Internal quotation marks omitted.) Id.

Looking to ethics opinions,[4] I note that, in *In re Inquiry to Advisory Committee on Professional Ethics Index No. 58-91 (B)*, 130 N.J. 431, 432–34, 616 A.2d 1290 (1992), the New Jersey Supreme Court considered whether a police officer actively employed by the township of Cherry Hill, and his second employer, a law firm located in that municipality, could represent clients in criminal matters arising therein. The court considered rule 1.7 (c) (2) of the New Jersey Rules of Professional Conduct, under which ''[a]ttorneys are disqualified from representing clients not only in cases of actual conflict, but also when representation begets an appearance of impropriety. Thus, multiple representation is impermissible 'in those situations in which an ordinary knowledgeable citizen acquainted with the facts would conclude

---

[4] As the majority observes in part III of its opinion, it is well settled that ''analogous'' rules of professional ethics for attorneys ''may be informative but are not determinative with respect to whether there is an actual conflict for [s]ixth [a]mendment purposes.'' *Perillo* v. *Johnson*, 205 F.3d 775, 798 (5th Cir. 2000); see, e.g., *United States* v. *Gallegos*, 39 F.3d 276, 279 (10th Cir. 1994); *United States* v. *Nissen*, 555 F. Supp. 3d 1174, 1190 (D.N.M. 2021); see also *Mickens* v. *Taylor*, 535 U.S. 162, 176, 122 S. Ct. 1237, 152 L. Ed. 2d 291 (2002) (''[t]he purpose of [the exception in *Sullivan*] from the ordinary requirements of *Strickland* . . . is not to enforce the Canons of Legal Ethics, but to apply needed prophylaxis in situations [in which] *Strickland* itself is evidently inadequate to [ensure] vindication of the defendant's [s]ixth [a]mendment right to counsel''); *Nix* v. *Whiteside*, 475 U.S. 157, 165, 106 S. Ct. 988, 89 L. Ed. 2d 123 (1986) (''breach of an ethical standard does not necessarily make out a denial of the [s]ixth [a]mendment guarantee of assistance of counsel'').

Diaz *v.* Commissioner of Correction

that the multiple representation poses substantial risk of disservice to either the public interest or the interest of one of the clients.' '' Id., 433. Recognizing the risk that a currently employed police officer could obtain ''sensitive information about private parties,'' the court noted that its ''overriding concern . . . for maintaining public confidence in the integrity of the legal profession'' led it to conclude that, as long as the police officer attorney ''remain[ed] a member of the Cherry Hill law enforcement team . . . no firm with which he is associated may represent private clients in Cherry Hill Municipal Court or in criminal matters arising in Cherry Hill.'' (Citation omitted; internal quotation marks omitted.) Id., 434. The court observed that the ''appearance of impropriety has special relevance for attorneys invested with the public trust, such as a government attorney or . . . an attorney who is a full-time police officer. . . . A municipal police officer, like a municipal attorney, is charged with major responsibilities in the effectuation of the criminal justice system at the local level— the apprehension and prosecution of violators of municipal ordinances as well as state criminal and quasi-criminal laws.'' (Citations omitted; internal quotation marks omitted.) Id., 435; see id., 433–34 (rejecting argument for application of exception for screening associates who are former government attorneys, given that attorney ''seeks to hold two jobs, not leave government service to enter private practice'').

In my view, where these authorities fall short in resolving the question of whether an active duty police officer is conflicted from service as a criminal defense attorney is their failure to consider the effect of what more contemporaneous scholarship has described as the culture of American policing—and the extent to which an active duty police officer seeking to represent a criminal defense client may consciously or unconsciously subscribe to, or be influenced by, that culture.

Diaz *v.* Commissioner of Correction

Specifically, their sterile focus on jurisdictional boundaries appears to fail to account for the phenomenon, described in compelling detail in Professor Barbara E. Armacost's lead article in The George Washington Law Review, of "the 'brotherhood in blue' and the 'thin blue line' " that have come to characterize the "organizational cohesiveness" and "service culture" of American policing. B. Armacost, "Organizational Culture and Police Misconduct," 72 Geo. Wash. L. Rev. 453, 453–54 (2004). Professor Armacost summarizes "[t]he organizational theory literature [that] provides a theoretical framework for what police scholars have long recognized: police officers are enmeshed in a distinctive organizational culture that powerfully influences their judgment and conduct. Cops are much more likely to frame their decisions in terms of [role based] obligations and expectations than according to a simple analysis of the costs and benefits of their actions." Id., 509. "As a number of scholars have framed it, police officers have a distinctive 'working personality'—e.g., a set of 'distinctive cognitive and behavioral responses'—that derives from certain characteristics of the police milieu. The foundation for this so-called working personality is the street cop or the cop on the beat, which serves as the common background or training ground for virtually all police officers from patrolmen to police chief. . . . As police officers on the beat are exposed to certain common variables of police work, they develop distinctive patterns of coping with these variables, which in turn come to define a distinct occupational culture of policing." (Footnotes omitted.) Id., 512–13. Citing the work of Professor Jerome Skolnick,[5] Professor Armacost observes that "the police officer's role contains two variables that are the primary determinants of the working personality of police officers: dan-

_____

[5] See B. Armacost, supra, 72 Geo. Wash. L. Rev. 494 n.240, 513 nn.365–74, citing J. Skolnick, Justice Without Trial: Law Enforcement in Democratic Society (2d Ed. 1975) pp. 42–57.

ger and authority. The danger entailed in police work—
and the sense among police officers that they hold the
thin blue line between order and disorder—makes
police officers 'especially attentive' to any indication
that violence or law breaking might be imminent.''
(Footnote omitted.) Id., 513. Further, the ''other variable
of police work, which reinforces this sense of isolation,
is the element of authority. Police are empowered to
intervene in a myriad of ways in the lives of ordinary
citizens, from giving traffic citations, to maintaining
order at public events, to enforcing public morality
through enforcing laws pertaining to gambling, prostitu-
tion, and drunkenness. Police authority in these areas
creates a *we/they* mentality, not only between the police
and the criminal element, but also between the law
enforcers and the general public.'' (Emphasis in origi-
nal; footnote omitted.) Id.; see id., 513–14 (''when the
policeman dons his uniform, he enters a distinct subcul-
ture governed by norms and values designed to manage
the strain created by an outsider role in the community''
(internal quotation marks omitted)). Ultimately, it is
taken as an '' '[article] of faith' in police culture'' that
''police officers consider themselves to be the 'thin blue
line' between societal order and disorder. Like the rest
of us, they see the negative effects of crime but, unlike
the rest of us, they have the authority and power to do
something about it.'' (Footnote omitted.) Id., 516–17.
Professor Armacost also observes that the ''call to do a
potentially dangerous job involving conflicting demands
and uncooperative or ungrateful citizens results
in a sense of *us versus them* that develops between
cops and the outside world. The bond resulting from
this siege mentality—the so called 'brotherhood in
blue'—creates a 'fierce and unquestioning loyalty to all
cops, everywhere.' Along with the bond of solidarity
is the sense that no one outside the ranks will really

Diaz *v.* Commissioner of Correction

understand the realities of policing.''[6] (Emphasis in original; footnotes omitted.) Id., 517.

Professor Seth W. Stoughton describes this culture as that of the warrior officer inherent in modern policing, which substantially derives from the militarization of police work as supported by federal initiatives that have equipped local police forces with ''military-grade equipment and training'' to support their roles as soldiers in the ''wars on crime, drugs, and terror . . . .'' S. Stoughton, ''Principled Policing: Warrior Cops and Guardian Officers,'' 51 Wake Forest L. Rev. 611, 647 (2016); see id. (''[t]he metaphor was clear: police officers were soldiers, and their day-to-day job involved fighting on the front lines''). Officers who adopt the ''[w]arrior'' mindset view themselves as ''the embodiment of the [t]hin [b]lue [l]ine, rather than the society that it protects . . . .'' Id., 654. Professor Stoughton observes that, ''[t]o those within the [w]arrior circle, only fellow [w]arriors have the right to censure each other; but in reality even other officers—or former officers—are discouraged from doing so.'' (Footnote omitted.) Id., 664. Discussing, for example, review of use of force decisions, Stoughton notes: ''Not only is second-guessing believed to be inap-

---

[6] Professor Armacost further observed: ''Cops are never told to be silent or to keep the agency's secrets. They never see an order upholding the code of silence that guides their working lives. There is no need to be explicit. The reactions, body language, whispered asides, and other rites of initiation convey what is expected. The code of silence serves to reinforce police bonds of solidarity, both of which make it difficult to investigate, with any accuracy, incidents that may involve mistakes or misbehavior.'' (Footnote omitted; internal quotation marks omitted.) B. Armacost, supra, 72 Geo. Wash. L. Rev. 517–18. With respect to the implementation of reforms targeted at corruption or excessive force, she observes that the ''conflict in the police bureaucracy between a set of broader values and goals articulated in formal policies and the informal norms of [street level] police culture highlights the tension between means and ends, which is 'at the heart of police work.' '' Id., 518; see id., 519 (''Institutional actors watch how other officers do things, and then they conform their own conduct to what they perceive as the norm. Even if police agencies have much the same formal rules, what differs is what agencies actually tolerate, because that is how cops learn what the agency really accepts.'').

Diaz *v.* Commissioner of Correction

propriate, it is also viewed as an obstacle to effective policing. Questioning and criticism, in this worldview, are proximate to treason; calling an officer's capabilities or honor into doubt shakes that officer's resolve by making an [already difficult] duty even less attractive. This allegedly endangers officers and weakens the [t]hin [b]lue [l]ine between order and chaos."[7] Id., 665; see

[7] Ample additional scholarly literature supports the "thin blue line" aspect of police culture documented by the work of Professors Armacost and Stoughton. See, e.g., R. Cohen, "The Force and the Resistance: Why Changing the Police Force Is Neither Inevitable, nor Impossible," 20 U. Pa. J.L. & Soc. Change 105, 113–14 (2017) (advocating law enforcement culture change from adversarial "warrior" mindset, which is product of line of duty dangers, to "guardian" mindset by embracing procedural justice and activities to cultivate public trust); V. Johnson, "Bias in Blue: Instructing Jurors To Consider the Testimony of Police Officer Witnesses with Caution," 44 Pepp. L. Rev. 245, 292 (2017) (describing " 'us against them' mentality" among some police officers arising from "the view that the police are under assault by the community they are meant to serve," which renders "officers . . . prone to group polarization," with "tunnel vision" and "confirmation bias[es]" that are potentially exacerbated by other unconscious racial biases); J. Manly, Note, "Policing the Police Under 42 U.S.C. § 1983: Rethinking *Monell* to Impose Municipal Liability on the Basis of Respondeat Superior," 107 Cornell L. Rev. 567, 571 (2022) ("The police subculture plays a crucial role in police agencies, providing a way for officers to deal with social isolation from their communities while simultaneously promoting a bond of solidarity among the ranks. But while such a subculture may help officers cope with the unique stressors of policing, the detrimental impact that such a subculture has on society as a whole outweighs any benefit that may be derived from its existence. The police subculture—characterized by secrecy, mutual support, and officer unity—effectively creates a code of silence, known colloquially as the 'blue wall.' This code of silence, while acting to further reinforce solidarity among the ranks, results in 'an informal norm of police culture that prohibits reporting misconduct committed by other police officers.' Officers who violate this informal norm by reporting their colleagues' misconduct risk suffering serious personal and professional repercussions." (Footnotes omitted.)); S. Ricciardi, Note, "Police Misconduct in Connecticut," 47 Conn. L. Rev. Online 37, 44–45 (2015) ("The '[b]lue [w]all of [s]ilence,' also known as the '[c]ode of [s]ilence' or the '[b]lue [c]urtain,' is one of the most persistent obstacles in excessive force litigation. The idea of a code of silence is not completely unimaginable. Police officers are faced with life and death situations more frequently than the public likely realizes, and a certain level of trust is expected out of necessity. However, the brotherhood mentality that has formed over time has become a barrier to transparency. 'The code of silence, adhered to by any officer who intends to remain on the job, provides a virtually impenetrable layer of protection for [violence prone] officers.' " (Footnotes omitted.)).

Diaz *v.* Commissioner of Correction

id., 666–67 (Professor Stoughton suggests that warrior culture "principles and value systems of policing" be replaced by "[g]uardian policing," which "seeks to instill officers with values that encourage public engagement, foster trust, and build lasting community partnerships. The result is safer and more effective law enforcement.").

I believe that aspects of the thin blue line culture of policing—particularly in a small state and in an age characterized by the instant sharing of information—may render it ethically and practically untenable for an active duty police officer to serve simultaneously as a criminal defense attorney, as it appears that the officer's loyalties will always be perceived to be in tension—even for those officers who make a conscious effort not to participate in that culture. At the very least, the apparent prevalence of the thin blue line renders disclosure, informed consent, and appropriate pretrial vetting paramount in cases in which a police officer attorney, who believes that he has eschewed participation in thin blue line culture, undertakes the representation of a criminal defense client. See, e.g., *State* v. *Davis*, 338 Conn. 458, 470–71, 258 A.3d 633 (2021). Ultimately, however, nothing in the record in this case, save for an oblique reference to the "goodwill" of Canace's fellow police officers in a section of a 1992 informal ethics opinion concerning the propriety of his representing clients in civil actions against individual members of the New Haven police department, touches on police culture. See Connecticut Bar Association Committee on Professional Ethics, Informal Opinion No. 92-04 (January 27, 1992). Because these cultural claims were not specifically raised before the habeas court, they cannot serve as a basis for overturning the petitioner's conviction, absent establishment of a record to the contrary.

Accordingly, I concur in the judgment reversing the Appellate Court's judgment dismissing the petitioner's

Diaz *v.* Commissioner of Correction

appeal and remanding the case to that court with direction to affirm the judgment of the habeas court.